**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| Rover Pipeline, LLC;<br>Energy Transfer LP,<br><br>    Plaintiffs,<br><br> v.<br><br>Federal Energy Regulatory Commission;<br>Chairman Richard Glick;<br>Commissioner James Danly;<br>Commissioner Allison Clements;<br>Commissioner Mark C. Christie;<br>Commissioner Willie L. Phillips; and<br>Chief Administrative Law Judge Carmen A.<br>Cintron,<br>in their official capacities,<br><br>    Defendants. | Civil Action No. _____<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DECLARATORY RELIEF**

| | |
|---|---|
| Gregory J. DeGulis (0045705)<br>MCMAHON DEGULIS LLP<br>812 Huron Road, Suite 650<br>Cleveland, OH  44115<br>Telephone:  (216) 621-1312<br>Facsimile:   (216) 621-0577 | William S. Scherman*<br>David Debold*<br>Jason J. Fleischer*<br>Vladimir J. Semendyai*<br>Jason Manion (0097031)*<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, DC  20036-5306<br>Telephone:  (202) 955-8500<br>Facsimile:   (202) 467-0539<br><br>*_Pro Hac Vice_ Application Forthcoming |

*Attorneys for Plaintiffs*

## COMPLAINT FOR DECLARATORY RELIEF

Rover Pipeline, LLC ("Rover") and Energy Transfer LP ("Energy Transfer")—(collectively, "Plaintiffs")—file this complaint against the Federal Energy Regulatory Commission ("FERC" or "the Commission"), as well as Chairman Richard Glick, Commissioner James Danly, Commissioner Allison Clements, Commissioner Mark C. Christie, Commissioner Willie L. Phillips, and Acting Chief Administrative Law Judge Carmen A. Cintron, all in their official capacities (collectively "Defendants").  Plaintiffs allege and pray as follows:

## PRELIMINARY STATEMENT

1.     In this case, FERC seeks to impose a $20 million civil penalty on Plaintiffs for allegedly violating federal law.  More specifically, FERC claims that Plaintiffs were not "forthright" about plans to remove a farmhouse from property Energy Transfer purchased to stage a business operations center, and FERC further alleges that this purported failure violated a regulation that FERC promulgated under the Natural Gas Act.  Central to Plaintiffs' Complaint here is *how* FERC intends to adjudicate the alleged violations.  FERC plans to do so in a manner contrary to law:  by putting Plaintiffs through an administrative enforcement action instead of filing an enforcement action against them in federal district court.  In particular, on January 20, 2022, FERC ordered a hearing by an administrative law judge ("ALJ") to adjudicate the alleged violations, and on January 25, 2022, Defendant Cintron assigned a presiding judge, ordered that presiding judge to convene a prehearing conference within 45 days, and scheduled the hearing itself for September 6, 2022.  FERC's plans would violate the governing statute—the Natural Gas Act—which vests federal district courts with "exclusive jurisdiction" of (1) "violations of" the Act and any related "regulations," as well as (2) "all suits in equity and actions at law" to "enforce any liability or duty created by" that statute or any "regulation"

promulgated "thereunder."  15 U.S.C. § 717u.  Moreover, FERC's administrative enforcement action would violate multiple constitutional provisions.  Plaintiffs are entitled to *inter alia* a declaratory judgment holding that FERC must litigate its claims in a lawsuit filed in federal district court, rather than in an in-house enforcement proceeding.

2.     The context for this dispute over *where* FERC must bring its enforcement action is the Rover Pipeline Project ("Project"), one of the largest natural gas pipeline projects ever undertaken.  It spans 713 miles—mostly in this judicial district (Northern Ohio)—and has the capacity to transport 3.25 billion cubic feet per day of natural gas from the Marcellus and Utica Shale production areas in Ohio and adjoining states to markets around the nation and in Canada.  The massive scope of the Project necessitated years of planning and extensive communications with FERC, Ohio regulators, and others.  A small component of the Project and the plans and communications related to that component are at issue in FERC's enforcement action.

3.     That small component is located in this judicial district, in Carroll County, Ohio.  On the other side of the road from one of the Project's facilities (a compressor station known as "CS1") and outside the Project's right-of-way was a rundown home, the Stoneman House (also referred to here as "the House"), built in 1843.  Among other things, it had holes in its roof, rotting floors, and electrical and plumbing systems that needed a complete overhaul.  The local fire department at one point even considered burning it down as part of a training exercise.  Still, like millions of other buildings in this country that meet the relevant age criteria and have a defined architectural style, the House was "potentially eligible" to be included on the National Registry of Historic Places ("NRHP").

4.     From the early stages of planning for the Project, Rover worked with FERC staff and Ohio's state historic preservation officer ("SHPO")—which FERC regulations designate as

the point of contact for historical resources like the Stoneman House—to create a plan to mitigate any visual or audial effects of CS1 on several surrounding properties, including the Stoneman House. Rover also told FERC, with reference to the House, that it would work with Ohio's SHPO "to formulate a screening plan to eliminate any effects (visual and audial) related to the Project," noting that Rover was "committed to a solution that results in no adverse effects to this resource." Conversations with FERC staff confirmed all parties' understanding that this commitment to avoid "adverse effects" was limited to CS1's visual and audial effects. The resulting plan was for Rover to mitigate adverse visual effects by painting CS1 in neutral colors and planting large trees around it to obscure CS1 from all surrounding properties, including the Stoneman House.

5. Pipeline companies regularly purchase land near one of their projects to assist with operational support for that and other regional assets. When companies make such a purchase, they often then schedule an evaluation of existing structures on the land for their suitability as offices, maintenance facilities, or storage locations. If, after such an evaluation, the structure is not deemed suitable for those purposes, common industry practice is to remove that structure to keep it from becoming a dangerous nuisance.

6. After identifying the ten-acre property on which the Stoneman House sat as a promising site for a new base of operations for employees servicing Energy Transfer's assets throughout the region (including CS1), Energy Transfer followed this standard industry practice and purchased the property. Energy Transfer intended, when it bought the property, to conduct a post-purchase evaluation to determine the feasibility of converting the House into an office for several employees. But, because it was possible that the House would end up being unsuitable for that purpose, before the purchase Energy Transfer and Rover confirmed via multiple sources

that no laws or regulations limited how Energy Transfer could use the Stoneman House and property.  None did.  Energy Transfer then took steps to preserve the House in anticipation of possibly repurposing it as an office.  A year and multiple onsite evaluations later, Energy Transfer determined that the Stoneman House was unsuitable for use as an office, primarily because of its size, layout, and condition.  Energy Transfer thus decided to remove the House.

7.    Months before removing the Stoneman House, Energy Transfer notified Ohio's SHPO of its plans to do so.  Ohio's SHPO did not ask Energy Transfer to delay or forego that removal.  Energy Transfer's outside counsel also consulted a FERC staff member, who said that removal of a potentially historic building was "a non-issue" if it "wasn't listed on the NRHP" and "it's not on the pipeline [right-of-way]"—both of which applied to the Stoneman House. Finally, Energy Transfer consulted with the Carroll County regional planning department and a local historical society to confirm that no local ordinances or zoning laws prohibited removing the Stoneman House.  Having confirmed all of this, Rover removed the House as part of using the property for its new operations center.

8.    FERC Enforcement Staff have taken issue with Energy Transfer's decision to remove the Stoneman House, alleging that Plaintiffs were not "forthright" enough with—or even "lied" to—FERC about plans for the House.  FERC thus proceeded with an enforcement action against Plaintiffs, charging that the alleged failure to be forthright violated 18 C.F.R. § 157.5, a regulation promulgated under the Natural Gas Act ("NGA").

9.    Of particular relevance to this lawsuit, FERC seeks to wrest from this Court its exclusive power to adjudicate the validity of FERC's own allegations.  Instead, FERC will force Plaintiffs through an enforcement proceeding before an ALJ, in which FERC's own officers and employees serve as prosecutors, judge, and jury on charges that Plaintiffs violated federal law

by not being forthright with FERC.  And if that proceeding yields a "finding" by FERC's ALJ that Plaintiffs have failed to disprove FERC's own allegations, FERC intends to extract civil penalties in excess of $20 million.  Under FERC's view, that agency proceeding will be the adjudication of Plaintiffs' alleged violations of federal law, leaving Plaintiffs with just one option:  seeking deferential court-of-appeals review.

10.    FERC's effort to deprive Plaintiffs of vast sums of money by forcing them through an administrative adjudicatory process for alleged NGA violations is itself forbidden under Section 24 of the NGA, which states, in relevant part:

> The District Courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter [*i.e.*, the NGA] or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder.

15 U.S.C. § 717u.

11.    FERC's effort also violates the separation of powers and is bereft of the basic constitutional protections that are guaranteed to *all* private parties when the government seeks to take their property.  FERC's in-house adjudication process flips the burden of proof, denies litigants basic procedural rights, and assigns the adjudication of law and facts to ALJs who are themselves FERC officers, whose appointments and removal protections violate the Constitution, and who work in offices located just a few feet away from those of the Commissioners.  This entire process is conducted without a jury, at a "hearing" where rank hearsay is routinely admitted for the truth of the matter asserted and the accused parties are often deprived of the right to confront the "testifying" witness.

12.     This lawsuit is brought to prevent FERC from violating Plaintiffs' statutory and constitutional rights by denying them a fair hearing, before a fair tribunal, and instead using an unlawful in-house administrative proceeding to adjudicate whether Plaintiffs violated 18 C.F.R. § 157.5(a)–(c), a FERC regulation that sets forth the "[p]urpose and intent" of the rules implementing the NGA.

13.     Not only does FERC lack statutory authority to subject Plaintiffs to administrative proceedings to adjudicate whether they have violated an NGA regulation or to impose civil penalties, the evidence FERC identifies in its relevant orders does not support a finding of any violation and, in fact, confirms that Plaintiffs were forthright with the Commission at all times during the relevant period.

14.     Accordingly, Plaintiffs ask the Court to issue a declaratory judgment to protect Plaintiffs' statutory and constitutional rights to have the underlying questions at issue—*i.e.*, whether Plaintiffs violated an NGA regulation, and, if so, the appropriate penalty—adjudicated in federal district court, in a proceeding overseen by a decisionmaker unaffiliated with FERC and with the independence of an Article III appointment, who will provide Plaintiffs the basic procedural protections that the law ensures.  Plaintiffs also seek a jury trial, followed by a judgment that they did not violate the NGA or any regulation thereunder.

15.     The judgment sought here would first declare that the NGA and the Constitution guarantee Plaintiffs the right to a jury trial in federal district court to determine whether any such violation has occurred, and second, declare that FERC must prove its allegations in that forum before FERC may exact the substantial civil penalties it seeks.  This declaratory relief is necessary because in every case in which FERC accuses persons or entities of violating the

NGA, it denies them their statutory and constitutional rights to have the claimed violations adjudicated in federal district court.

16.     Starting with Plaintiffs' statutory rights, the NGA guarantees them the right to have a federal court—not a FERC officer—adjudicate the alleged violations here.  From the time of its enactment and continuing to the present, the NGA has granted federal district courts "exclusive jurisdiction of violations of" the NGA and "the rules, regulations, and orders thereunder."  15 U.S.C. § 717u.  When Congress added a "civil penalty" provision to the NGA in 2005, it retained the federal district courts' exclusive jurisdiction of violations, while giving FERC new authority limited to *proposing* penalty amounts to assess for alleged violations after "notice and opportunity for public hearing."  15 U.S.C. § 717t-1(b) & (c).

17.     Despite Congress's explicit delineation of these separate roles for FERC and the federal courts, FERC contends that the NGA allows it to circumvent federal district courts, deprive accused parties of their statutory right to an Article III tribunal, and instead force them to defend themselves in an unlawful ALJ adjudicative proceeding that lacks many of the most basic constitutionally required procedural protections routinely available in federal court.  Under FERC's view, it can hold an in-house proceeding resulting in fines of up to $1,000,000 *per day per violation*, without due process under the law.

18.     From the start of FERC's agency proceedings, it affords its Enforcement Staff a home court advantage.  It puts the burden on those accused of violations to establish that they have not committed the alleged violation and show why they should not be required to pay penalties.  Those penalty amounts have already been approved within FERC and can be in the tens or even hundreds of millions of dollars.  If the accused fails to prove his or her innocence to the Commission's satisfaction, the Commission reserves the right to impose its proposed

penalties without ever providing an opportunity for an evidentiary hearing with live testimony. Even if the Commission decides to hold a hearing, it will assign that job to an ALJ who does not follow the Federal Rules of Civil Procedure or the Federal Rules of Evidence, and does not acknowledge any obligation to allow the accused to confront witnesses whom the FERC attorneys have been allowed to depose *ex parte*.

19.     FERC ALJs are appointed by the Chairman of FERC acting alone, and they are overly protected from removal, in violation of Article II of the Constitution.  FERC ALJs exercise substantial discretionary authority in how they conduct these hearings, and they ultimately make purported findings of fact and conclusions of law that carry serious consequences.  The most recent NGA enforcement action subject to such a hearing, *BP Am., Inc.* ("*BP*"), 173 FERC ¶ 61,239 at P 16 (2020), shows that ALJs continue the Commission's illegal practice of burden shifting, which requires targets to prove that they did not commit the alleged violations, rather than requiring FERC's Enforcement Staff to prove their allegations.

20.     In every civil penalty proceeding that a FERC ALJ has adjudicated since 2005, save one, the ALJ that FERC has assigned has agreed with the Commissioners and imposed the Commission's proposed penalties.  After the ALJ approves the fine, the Commissioners—the very people who (i) initiated and oversaw the investigation, (ii) determined after *ex parte* communications with Enforcement Staff whether those Staff had made a case, (iii) approved the terms and parameters under which Enforcement Staff are allowed to settle the case, and (iv) voted on the size of the penalty for the accused's violations—then "hear" any appeal of the ALJ's findings and penalties.  The Commission's Advisory Staff members advise the Commissioners at every stage of the case, including the appeal, even though the Advisory Staff

members engage in *ex parte* off-the-record conversations with Enforcement Staff about the merits of the case while Enforcement Staff investigate the allegations.

21.     Despite depriving the accused of many of the most basic procedural protections that one is entitled to receive when the government seeks to take away substantial property, FERC claims the power to use its purported administrative adjudication to order fines even greater than those authorized for *criminal* violations of the same statute.  If a jury convicts a criminal defendant of violating the NGA, the maximum penalty for each count is $1,000,000, a five-year prison term, or both.  But when a FERC ALJ, and later the Commission, purports to find the same violation, made up of the same elements, the fine can be much higher—up to $1,000,000 *per day per violation*.  FERC also determines its penalties using guidelines that it deliberately modeled after the federal sentencing guidelines for criminal offenses—the same provisions that apply to corporations and other organizations convicted at a criminal trial.

22.     According to FERC, all of this takes place without any opportunity for the accused to obtain an unbiased adjudication of the charges against it in federal district court.  No Article III judge has any role to play, in FERC's view, until after the Commission issues a final order finding violations and imposing penalties.  Moreover, that order, according to FERC, can be reviewed only in a federal court of appeals under deferential standards that routinely favor FERC.  Indeed, the Commission's position is that the statute requires courts of appeals to give the same deference to FERC's determinations in enforcement proceedings that the court applies to other Commission orders under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  FERC's processes therefore leave no opportunity for an Article III judge to conduct a de novo trial with all the constitutional and procedural safeguards that apply in federal district court proceedings.

23.    FERC's unlawful and unconstitutional approach to the adjudication of alleged NGA violations thus seeks to divest federal district courts of the "exclusive jurisdiction of violations" of the NGA that Congress expressly conferred upon them, 15 U.S.C. § 717u, and to deprive accused parties of their day in court and of any semblance of due process.  And FERC does so on the basis of a 2005 amendment to the NGA that imported statutory language from the Federal Power Act ("FPA") and Natural Gas Policy Act ("NGPA")—language that indisputably produces precisely the opposite result.  The legislative history of the 2005 amendment confirms it was intended to *preserve*, not eliminate, the right of accused parties to require FERC to prove its case in federal district court, rather than in a proceeding before an ALJ whom FERC's Chairman unconstitutionally hand-picks.

24.    Plaintiffs are entitled to relief in the form of a declaratory judgment stating that FERC must litigate Plaintiffs' alleged NGA violations in federal district court because such a process is mandated by the NGA, the Administrative Procedure Act ("APA"), and the Constitution.  In particular, the judgment should declare the following:

a.    FERC has no legal authority to conduct a purported ALJ or paper hearing adjudication of alleged violations of the NGA, because nothing in the NGA grants such authority, and Section 24 of the NGA, 15 U.S.C. § 717u, instead grants federal district courts "exclusive jurisdiction of violations" of the NGA and the rules and regulations thereunder and of "all suits in equity and actions at law" to "enforce any liability or duty created by" that statute or any "regulation" promulgated "thereunder."  *Id*.

b.    FERC's action would violate Article III of, and the Fifth and Seventh Amendments to, the United States Constitution by denying Plaintiffs their rights to an impartial judicial tribunal, due process protections, and a trial by jury.

c.    FERC's action would violate the Appointments Clause of Article II and Article II's grant of the government's executive power to the President because FERC's ALJs are executive officers who have not been appointed by the head of a department (meaning the full Commission), as the Constitution requires, and they are overly protected from removal by the President.

d.    FERC's action would violate the APA's bar on *ex parte* communications. *See* 5 U.S.C. § 554(d) (prohibiting employees who "engaged in the performance of investigative or prosecuting functions for an agency" from "participat[ing] or advis[ing] in the decision, recommended decision, or agency review" of any "factually related case").

25.    This declaratory relief is necessary to preserve Plaintiffs' right to have all wrongs that the Commission seeks to allege adjudicated in federal district court, as Congress expressly provided, and to safeguard Plaintiffs' constitutional rights, including their rights to due process and trial by jury.

26.    Plaintiffs are also entitled to relief in the form of a judgment, following a jury trial, that they did not violate the NGA or FERC's rules and regulations thereunder, specifically 18 C.F.R. § 157.5(a)–(c).  That judgment would recognize that Plaintiffs (i) arranged the purchase of the ten-acre property on which the Stoneman House stood with the intent of creating there a base of operations to service all of Energy Transfer's regional assets, (ii) determined after a year and multiple onsite evaluations that the Stoneman House was too old, decrepit, and beyond reasonable repair to be suitable for use in furtherance of that intent, (iii) notified the relevant authorities months in advance, without any duty to do so, of their

intent to remove the Stoneman House, and (iv) finally removed the Stoneman House, as was their legal right.  In taking these steps, Plaintiffs complied with 18 C.F.R. § 157.5.

## PARTIES

27.     Plaintiff Rover is a limited liability company organized under Delaware law and headquartered in Houston, Texas.  Rover is a subsidiary of Plaintiff Energy Transfer.  Rover built and operates the Rover Pipeline, an interstate natural gas project that transports up to 3.25 billion cubic feet per day of domestically produced natural gas to markets in the Midwest, Northeast, East Coast, Gulf Coast, and Canada.  The completed line has direct deliveries to Ohio, West Virginia, Michigan, and into the Dawn Hub in Ontario, Canada, which has a broader network of distribution points back into the U.S., including the Northeast, and into the Canadian market.

28.     Plaintiff Energy Transfer is a Limited Partnership organized under Delaware law and headquartered in Dallas, Texas.  It owns and operates a diversified portfolio of energy assets, including Plaintiff Rover.  Energy Transfer's core operations include complementary natural gas midstream, intrastate and interstate transportation and storage assets; crude oil, natural gas liquids, and refined product transportation and terminalling assets; natural gas liquids fractionation; and various acquisition and marketing assets.

29.     Defendant FERC is an independent agency of the United States government, headquartered in Washington, D.C.  By statute, FERC is headed by five Commissioners appointed for fixed terms and confirmed by the Senate, with one Commissioner serving as Chairman at the discretion of the President.  FERC's jurisdiction pursuant to the NGA includes authority to regulate the interstate sale of physical natural gas products.

30.     Chairman Richard Glick is a natural person and FERC Commissioner with a term that expires June 30, 2022.

31.     Commissioner James Danly is a natural person and FERC Commissioner with a term that expires June 30, 2023.

32.     Commissioner Allison Clements is a natural person and FERC Commissioner with a term that expires June 30, 2024.

33.     Commissioner Mark C. Christie is a natural person and FERC Commissioner with a term that expires June 30, 2025.

34.     Commissioner Willie L. Phillips is a natural person and FERC Commissioner with a term that expires June 30, 2026.

35.     Chief Administrative Law Judge Carmen Cintron is a natural person and the Chief Administrative Law Judge at FERC.  Judge Cintron was appointed to that position by former FERC Chairman Norman C. Bay in 2016.

**VENUE**

36.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) & (e), and 15 U.S.C. § 717u, because this action seeks a declaration of the proper forum in which to adjudicate Plaintiffs' liability for alleged NGA violations arising out of alleged representations about Plaintiffs' construction of Rover Pipeline, most of which is located in this district.  In particular, the allegations relate to Plaintiffs' construction of CS1 in this district, Plaintiffs' planned and actual efforts to mitigate the visual and audial effects of CS1 on properties in this district, Plaintiffs' purchase of the Stoneman House and property in this district, and Plaintiffs'

later act in this district of removing the Stoneman House.[1]  The allegations also include multiple alleged omissions, grounded in an alleged duty by Plaintiffs' employees to make certain statements and disclosures while in this district about activities occurring in this district.  These events and omissions occurring in this district give rise to the dispute between the parties over whether Plaintiffs violated the law.

37.     Under 28 U.S.C. § 1391(b) & (e), the usual venue provisions for suits against federal agencies, venue is clearly appropriate because a "substantial part of the events or omissions" giving rise to this dispute occurred in this district.

38.     The NGA's exclusive-jurisdiction provision, 15 U.S.C. § 717u, also governs venue in suits "brought to enforce any liability or duty created by, or to enjoin any violation of," the NGA "or any rule, regulation, or order thereunder," and states that venue in such suits is appropriate "in the district wherein any act or transaction constituting the violation occurred." FERC seeks to "enforce" a "liability or duty created by" an NGA regulation.  And many, if not most, of the acts and transactions constituting the violations that FERC alleges occurred in this district.  Thus, venue is appropriate in this district under § 717u if FERC complies with the statute by suing Plaintiffs in a federal district court for Plaintiffs' alleged violations of the NGA.

39.     Under either venue provision, Plaintiffs' alleged acts and omissions in this district comprise a substantial part of the alleged NGA violations giving rise to FERC's civil penalty claims against Plaintiffs, and thus giving rise to this action, making this district a proper forum for this suit.

---

[1]  *See* FERC's Reply to Rover Pipeline LLC and Energy Transfer L.P.'s Answer to Order to Show Cause, at 33–34, *Rover Pipeline LLC and Energy Transfer L.P.*, Dkt. No. IN19-4-000 (FERC July 21, 2021) (describing "Rover's final decision to destroy the House without informing" FERC as a violation of the NGA and part of the "continuing violation" that FERC alleges).

## STANDING

40.     Plaintiffs have standing to bring this lawsuit.  Plaintiffs, who are accused of violating the NGA, challenge FERC's adjudication of such allegations against Plaintiffs in an administrative tribunal.  As explained in greater detail below, FERC initiated a formal investigation of the conduct at issue here in November 2016; issued a public Staff Notice of Alleged Violations on July 13, 2017 that summarily accused Plaintiffs of violating the NGA and one of its regulations; and issued a formal, non-public notice to Plaintiffs pursuant to 18 C.F.R. § 1b.19 on April 3, 2018, stating that the Enforcement Staff would ask the Commission to issue an order directing Plaintiffs to show cause why they should not be made the subject of a public FERC enforcement proceeding and pay a civil penalty.  The objects of Enforcement Staff's proposed enforcement action were (i)  the adjudication of Enforcement Staff's allegations that Plaintiffs violated Section 7 of the NGA, 15 U.S.C. § 717f, and FERC's regulation setting forth the "[p]urpose and intent" of its rules implementing the NGA, 18 C.F.R. § 157.5(a)–(c), and (ii) to impose substantial civil penalties against Plaintiffs, including tens of millions of dollars in fines.

41.     Following Enforcement Staff's 18 C.F.R. § 1b.19 notice, the Commission issued an Order to Show Cause on March 18, 2021 that initiated an adversarial FERC enforcement proceeding.  *Rover*, 174 FERC ¶ 61,208 (2021).  It directed Plaintiffs to show cause why they should not be found to have violated 18 C.F.R. § 157.5.  Plaintiffs filed an Answer and Denial with the Commission on June 21, 2021, explaining why the Commission's enforcement proceedings against them are flawed not only on the merits, but also on jurisdictional, procedural, and constitutional grounds.  Nonetheless, on January 20, 2022, the Commission ordered an ALJ hearing, thus bringing an agency proceeding against Plaintiffs in which FERC

purports to use an unlawful in-house adjudication to make a binding determination that Plaintiffs violated the NGA and impose tens of millions of dollars in civil penalties for those purported violations, subject only to deferential review by a federal court of appeals.  The matter has since been assigned to a presiding FERC ALJ and a schedule for the matter has been set, with an initial prehearing conference to occur in the coming weeks and a trial-type hearing starting September 6, 2022.  Plaintiffs have therefore each suffered injury directly traceable to FERC's actions in violation of the NGA, the Appointments Clause, the Constitution's separation of powers, Article III, and the Fifth and Seventh Amendments of the U.S. Constitution by being forced to defend themselves in *ultra vires* administrative proceedings and being deprived of their right to a jury trial in federal district court and before a properly appointed, independent Article III judge to determine whether any such violations occurred. Plaintiffs will each continue to suffer such injury each day until this Court restrains the Commission from exceeding its jurisdiction set by Congress in NGA Section 24, 15 U.S.C. § 717u.  Plaintiffs therefore have standing to bring this challenge to FERC's procedures.

## JURISDICTION

42.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 2201; and 15 U.S.C. § 717u.

## I.    The NGA Gives Federal District Courts Exclusive Jurisdiction To Adjudicate Alleged Violations Of The NGA.

43.    FERC is an independent federal agency charged with the regulation of, among other things, the interstate transmission and sales of natural gas and electricity, and the interstate transportation of oil.  FERC administers three core statutes:  the FPA, 16 U.S.C. §§ 791–828c; the NGA, 15 U.S.C. § 717–717z; and the NGPA, *id.* §§ 3301–3432.  When Congress enacted both the FPA (originally named the Public Utility Act of 1935) and the NGA (in 1938), each

time it vested federal district courts with "exclusive jurisdiction of violations" of the relevant statute, 16 U.S.C. § 825p; 15 U.S.C. § 717u. Congress did not alter the district courts' exclusive authority when it enacted the NGPA in 1978 (which, among other things, gave FERC certain powers related to *intrastate* natural gas production and transmission). Nor did Congress remove exclusive district court jurisdiction when it amended the FPA and the NGA years later to provide for civil penalties for violations of those statutes. "Violations" are the common thread for seeking injunctions, criminal penalties, and civil penalties. And only federal district courts—not FERC—are authorized to adjudicate whether anyone violated the NGA (including its rules or regulations) and, if so, whether to impose injunctions, criminal penalties, or civil penalties.

### A. The Federal Power Act And The Natural Gas Act.

44. The FPA authorizes FERC to regulate interstate transmission of electricity, including by licensing hydroelectric facilities and setting wholesale electricity rates. 16 U.S.C. §§ 797(e), 824d.

45. The NGA, the statute directly at issue here, adds the power to regulate interstate natural gas pipelines and transmission of natural gas in interstate commerce, including by rate-setting and approving the siting, operation, and abandonment of natural gas facilities. 15 U.S.C. §§ 717c, 717f.

46. Congress enacted the FPA and the NGA as part of a series of New-Deal-era regulatory statutes, in each of which Congress expressly gave federal district courts "exclusive jurisdiction" of "all suits in equity and actions at law brought to enforce any liability" under those statutes. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1568, 1571–72 & n.3 (2016) (citation omitted); *see* 16 U.S.C. § 825p (FPA); 15 U.S.C. § 717u (NGA). The Supreme Court has explained that these various statutes' underlying exclusive-

jurisdiction provisions are "materially indistinguishable." *Merrill Lynch*, 136 S. Ct. at 1571.  In some of those statutes from that era, Congress also expressly provided an exception to such jurisdiction by authorizing agency adjudication in certain defined circumstances.  *See e.g.*, 15 U.S.C. § 78u-2 (Securities Exchange Act); 16 U.S.C. § 823b(d)(2) (FPA).  Critically, unlike other New Deal-era statutes with exclusive jurisdiction provisions, at no time has the NGA included such an exception to that exclusivity.

47.    The FPA and the NGA grant FERC two distinct types of authority, each with a delineated role for federal courts.  First, FERC exercises traditional *regulatory* authority by issuing final "order[s]," *e.g.*, 16 U.S.C. § 824d(e); 15 U.S.C. § 717c(e), such as licensing orders, rate-making orders, or orders in other contexts (*i.e.*, apart from the context of possible "violations" giving rise to civil penalties under either statute).  *See, e.g.*, 15 U.S.C. § 717d(a) (FERC may "fix . . . by order" "just and reasonable rate[s]" for the transportation and sale of natural gas); *id.* § 717f(a) (FERC may "by order direct a natural-gas company to extend or improve its transportation facilities"); *id.* § 717g(a) (FERC "may determine by order the accounts in which particular outlays or receipts shall be entered, charged, or credited").  Persons aggrieved by FERC orders of this sort (*i.e.*, regulatory orders that do not concern possible NGA or FPA violations) may challenge them in the federal courts of appeals under the judicial review provisions in these two statutes—Section 313 of the FPA and Section 19(b) of the NGA—and that review is deferential.  The Commission's findings in such cases are treated as "conclusive" if "supported by substantial evidence."  16 U.S.C. § 825l(b); 15 U.S.C. § 717r(b).

48.    Second, each statute vests federal district courts with exclusive jurisdiction to find *violations* of the statute (or the rules, regulations, and orders thereunder) and order remedies for those violations.  Specifically, Section 17 of the FPA and Section 24 of the NGA grant federal

district courts "exclusive jurisdiction" of: (1) "violations of" each statute and "the rules, regulations, and orders thereunder"; and (2) "all suits in equity and actions at law" to (a) "enforce any liability or duty created by" the statute or "any rule, regulation, or order thereunder"; or (b) "enjoin any [such] violation." 16 U.S.C. § 825p; 15 U.S.C. § 717u. From the beginning, therefore, district courts were empowered to adjudicate alleged violations, while courts of appeals were empowered to review Commission orders in non-enforcement settings.

49.   Under this statutory framework, FERC has authority to *investigate* possible violations of its core statutes before initiating enforcement proceedings in federal district court. Section 14 of the NGA, for example, grants the Commission authority to "investigate any facts" it finds "necessary or proper" in order "to determine whether any person" has violated the NGA. 15 U.S.C. § 717m(a). In exercising its regulatory or investigative authority, FERC may hold "hearings" before either its ALJs or the full Commission. *See, e.g.*, *id.* § 717n(e). But the power to investigate and hold hearings is not the power to adjudicate violations or impose legally binding penalties for them; as explained above, FERC's core statutes reserve those powers exclusively to the federal district courts.

50.   As discussed further below, until 1986 (for the FPA) and 2005 (for the NGA), "violations" of each statute yielded only two possible remedies—injunctive relief or criminal penalties—and each was the exclusive province of federal district courts. 16 U.S.C. §§ 825m, 825o; 15 U.S.C. §§ 717s–717t. FERC thus has a long history of not even asserting authority to adjudicate or remedy FPA or NGA violations through its own in-house administrative proceedings.

B.      **The Natural Gas Policy Act**

51.     Congress first authorized civil penalties for violations of any FERC-administered statute when it enacted the NGPA in 1978.  The NGPA mirrors the FPA and the NGA in each relevant respect.

52.     First, just like the FPA and the NGA, the NGPA gives FERC regulatory authority, which means the Commission may issue orders regulating certain energy transportation (specifically, intrastate and interstate natural gas pipeline transportation), *e.g.*, 15 U.S.C. § 3371, with the same judicial review of those regulatory orders in the courts of appeals, *id.* § 3416(a)(4).   Second, the NGPA preserves federal district courts' longstanding power to adjudicate alleged statutory "violations" and impose appropriate "penalties."  Specifically, each remedy authorized for NGPA violations—criminal penalties, *id.* § 3414(c); injunctive relief, *id.* § 3414(b)(1); and civil penalties, *id.* § 3414(b)(6)—is available only after a federal district court finds a violation.  *See also* 15 U.S.C. § 3414(b)(6)(E)–(F) (Commission "assess[es]" a civil penalty after "notice of the proposed penalty," and then "shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty" in a "de novo" federal court proceeding).   Indeed, according to FERC's own interpretation of the NGPA, "Congress created an affirmative right for the person to receive review of the Commission's [proposed penalty] assessment in a trial de novo in district court." *Energy Transfer Partners, L.P.*, 121 FERC ¶ 61,282, at P 34 (2007) ("*ETP*"); *see also Greenlaw v. Garrett*, 59 F.3d 994, 999 (9th Cir. 1995) ("trial de novo" "mean[s] a trial on the merits; not de novo review of an administrative record").

53.     Thus, with the adoption of this new form of penalty (a civil penalty), Congress gave the Commission a role in *proposing* the penalty amount to assess, while maintaining the

long-established practice of conferring federal district courts with exclusive jurisdiction to *adjudicate* whether a violation giving rise to a civil penalty has occurred.

### C.    The Electric Consumers Protection Act And The Energy Policy Act Of 1992

54.    Congress first incorporated civil penalties into the FPA with the Electric Consumers Protection Act, Pub. L. No. 99-495, 100 Stat. 1243 (1986).  This 1986 statute added Section § 31(c) to the FPA, which directs FERC to "determin[e] the amount of a proposed penalty" and "asses[s]" that penalty "after notice and opportunity for public hearing."  16 U.S.C. § 823b(c) (listing factors FERC must consider in "determining the amount of a proposed penalty").  New Section 31(d) in turn outlined the procedure FERC must follow to assess these new civil penalties.  *See* 16 U.S.C. § 823b(d).

55.    Under new Section 31(d), FERC exercises this added authority in two distinct phases—an investigative phase and an adversarial phase.  During the "investigative phase," FERC "submit[s] document requests" and takes depositions of a respondent's employees, and that respondent is "able to submit documents presenting facts and arguments in their defense."  *FERC v. Maxim Power Corp.*, 196 F. Supp. 3d 181, 187 (D. Mass. 2016).  Respondents, on the other hand, "d[o] not have the right to make any document requests, depose or cross-examine any witnesses, or put on their own witnesses."  *Id.*  Once Enforcement Staff conclude their investigation, they issue a notice to respondent pursuant to 18 C.F.R. § 1b.19, stating their intention to recommend to FERC that the Commission issue an Order to Show Cause.

56.    When the Commission issues an Order to Show Cause, it concludes the investigation phase and begins what FERC has called a "very different" "adversarial show cause proceeding."  FERC's Memorandum on Procedures Applicable to This Case at 7, *FERC v. Maxim Power Corp.*, Civ. No. 15-30113 (D. Mass. Jan. 20, 2016) (ECF 44) ("*Maxim* FERC Memorandum") (capitalization omitted); *see also Maxim*, 196 F. Supp. 3d at 195 ("FERC

consistently seeks to characterize the proceeding which took place before the penalty assessment as an 'adversarial proceeding.'"). During this adversarial phase at the agency, respondents are ordered to file an answer, in which they are instructed to "address any matter, legal, factual or procedural, that they would urge in the Commission's consideration of this matter." *Maxim Power Corp., et al.*, 150 FERC ¶ 61,068 at P 6(D) (2015) (Order to Show Cause and Notice of Proposed Penalty) ("*Maxim* Show Cause Order"). However, during this phase, a respondent is still "unable to seek discovery, depose witnesses interviewed by FERC, gain any insight into the presentation of the case made by FERC's enforcement staff to the Commissioners during the investigative phase, or present their own witnesses." *Maxim*, 196 F. Supp. 3d at 196. FERC has stated that the Order to Show Cause "also is the notice of proposed penalty required pursuant to section 31 of the FPA." *Id.*

57.    In a respondent's answer to such a Show Cause Order—*i.e.*, after FERC has given notice of its proposed penalty—it must elect whether to submit to adjudication by FERC before an ALJ under Section 31(d)(2) of the FPA or, instead, have the Commission immediately assess the proposed penalty and proceed to district court. *Maxim* Show Cause Order, at ¶ 5; *cf.* 16 U.S.C. § 823b(d)(2)–(3). If a respondent chooses to proceed with adjudication in federal district court, FERC issues a legally non-binding order assessing a penalty and files an action in a district court for a *de novo* adjudication. Statement of Administrative Policy Regarding the Process for Assessing Civil Penalties, 117 FERC ¶ 61,317 at P 5.1.b (2006) ("2006 Policy Statement"). That penalty assessment ends the "adversarial phase" at FERC and, with it, FERC's administrative adjudicatory authority. In matters where a respondent makes this election, FERC has nothing left to do on the administrative front. Rather, after assessing the proposed penalty, FERC's next step is to initiate, and become a party to, district court litigation.

58.     In enacting these FPA amendments in 1986, Congress left in place the text of Section 317, which continues to vest district courts with "exclusive jurisdiction" of violations. Consistent with the decision not to repeal that provision, Congress added Section 31(d), which separately and expressly provides for administrative adjudication in limited circumstances, primarily when the *accused party voluntarily elects* to proceed with agency adjudication.  16 U.S.C. § 823b(d)(1)–(2).[2]  In these instances only, the FPA expressly authorizes FERC to make a "determination of violation" "on the record" after a formal "agency hearing pursuant to" the Administrative Procedure Act ("APA") § 5 "before an" ALJ, and then to "assess the penalty, by order."  *Id.* § 823b(d)(2)(A).  Congress added this express exception to exclusive district court jurisdiction in only the FPA; as discussed below, the NGA has never included similar provisions authorizing FERC to adjudicate any violations of that statute or its rules, regulations, or orders.

59.     Thus, the FPA gives the accused the option to reject administrative adjudication in favor of litigation in the district court.  *See* 16 U.S.C. § 823b(d)(1), (3).  And when that party elects district court adjudication for alleged violations and associated civil penalties— effectively standing on the FPA § 317 right to an Article III proceeding—FERC "promptly assess[es]" the civil penalty it seeks by "order," and "institute[s] an action" in the appropriate federal district court to adjudicate the merits of its assessment.  *Id.* § 823b(d)(2)(A)–(B).  In that action, the district court must *independently* determine in "a trial *de novo* subject to the Federal Rules of Civil Procedure"—that is, "an ordinary civil action," *Maxim Power*, 196 F. Supp. 3d at 191—whether a violation has occurred and whether FERC's proposed penalty is warranted,

---

[2]  The only circumstance in which agency adjudication is *forced* on accused parties is when FERC seeks no more than $10,000 in penalties for alleged violations of orders mandating compliance with the terms of FPA licenses and permits.  16 U.S.C. § 823b(a), (d)(1)–(2).

with "no deference" to FERC's assessment, *FERC v. MacDonald*, 862 F. Supp. 667, 672 (D.N.H. 1994).  FERC's initial penalty assessment is not binding and cannot be enforced or collected—or reviewed in the federal courts of appeals, *see* 2006 Policy Statement at P 5.2— until the district court in such a proceeding "enter[s] a judgment enforcing" or "modifying, and enforcing as so modified," FERC's proposed penalties, 16 U.S.C. § 823b(d)(3)(B), (d)(5).

60.     These FPA provisions establish that—with the narrow exception of express carve-outs—Congress gave the Commission authority to "assess" penalties it has "propose[d]" for violations, *not* the power to impose penalties.  Instead, after the Commission assesses a penalty, it must initiate a proceeding in federal district court for an Article III judge to adjudicate whether a violation was in fact committed and, if so, whether FERC's proposed penalties are warranted.

61.     In 1992, Congress authorized civil penalties for violations of additional FPA provisions.  *See* Pub. L. No. 102-486, 106 Stat. 2776 (Energy Policy Act of 1992).  In doing so, Congress followed the same model and expressly incorporated the "proposed penalty" and "option to elect" language of FPA Section 31.  The new provision, FPA Section 316A, directs FERC to "determin[e] the amount of a proposed penalty," which "shall be assessed by the Commission, after notice and opportunity for public hearing, in accordance with" Section 31(d). 16 U.S.C. § 825o-1(b).  The statute also lists factors that the Commission must take into consideration "[i]n determining the amount of a *proposed* penalty."  *Id.* (emphasis added).

62.     Consequently, district courts retain the "exclusive" authority to adjudicate FPA "violations" absent consent by the accused or the narrow express exception for smaller penalties.  Indeed, each time Congress legislated to authorize civil penalties under FERC-enforced statutes, it adopted a framework under which FERC merely "propose[s]" penalties

after a "hearing," assesses the penalty, and then must present the alleged violation in federal district court, where an Article III judge adjudicates the alleged violation and the penalty if the violation has been proven.  Moreover, in the limited circumstances where Congress authorized agency adjudication of penalties, it did so expressly, spelling out the process of formal ALJ hearings and adding a separate provision for judicial review in the courts of appeals of those particular determinations.  As explained below, Congress did not do so when it amended the NGA.

### D.  The Energy Policy Act Of 2005

63.  Congress, in enacting the Energy Policy Act of 2005, increased the civil penalties available for NGPA violations from $5,000 to $1,000,000, and for certain FPA violations from $10,000 to $1,000,000.  At the same time, Congress preserved both statutes' procedures for district court adjudication of violations subject to such penalties.  That statute also authorized—for the first time ever—NGA civil penalties in the statutory provision at issue in this case.  *See* Pub. L. No. 109-58, §§ 314, 1284, 119 Stat. 594, 691, 980 (2005).

64.  That new civil penalty provision, Section 22 of the NGA, provides that "[a]ny person that violates" the NGA or related rules "shall be subject to a civil penalty of not more than $1,000,000 per day per violation."  15 U.S.C. § 717t-1(a).  Section 22 also permits FERC to hold a "hearing" in order to "assess[]" a civil penalty, 15 U.S.C. § 717t-1(b), and specifies the factors FERC may consider "[i]n determining the amount of a *proposed* penalty," *id.* § 717t-1(c) (emphasis added).  At the same time, though, Congress did not disturb the text of Section 24, leaving intact district courts' "exclusive jurisdiction" of NGA "violations" and "all" actions to "enforce any liability or duty" under the Act.  *Id.* § 717u (renumbered based on the addition of new provisions).

26

65.     Importantly, Congress used language in NGA Section 22 that is materially identical to that in FPA Section 31(c).  The FPA provision directs FERC to "determin[e] the amount of a proposed penalty" and "asses[s]" that penalty "after notice and opportunity for public hearing."  16 U.S.C. § 823b(c).  NGA Section 22 directs FERC to "determin[e] the amount of a proposed penalty" and "asses[s]" that penalty "after notice and opportunity for public hearing."  15 U.S.C. § 717t-1(b)-(c).  Both statutes—the NGA and the FPA—use that language to create a comparable intermediate step in which FERC holds a "hearing" to "assess" the penalty that it proposes.

66.     The FPA and the NGA differ in one important respect, however.  As noted, FPA Section 31(d) grants FERC jurisdiction to administratively adjudicate certain FPA violations if *inter alia* the accused party elects to forego district court adjudication.  But the NGA does *not* include a provision comparable to FPA Section 31(d).  That is, Section 22 of the NGA—unlike FPA Section 31(d)—contains no exception to the background rule of "exclusive" federal court jurisdiction of violations.  It therefore does not spell out the formal administrative adjudication procedures that FERC would need to employ if an exception existed; and it lacks the express provision for judicial review of administrative orders that would result if the NGA had an exception to exclusive federal district court jurisdiction of NGA violations.

## II.     FERC's Enforcement Process Forces Plaintiffs To Undergo An Unlawful Administrative Proceeding.

67.     FERC flatly rejects the view that federal district courts have exclusive jurisdiction to adjudicate NGA violations.  It believes it can assign FERC ALJs to adjudicate FERC's own allegations, with the Commission making a final determination of civil penalties that can total tens or even hundreds of millions of dollars.  Indeed, FERC contends that Section 22's provision for a "hearing" does not even require an ALJ hearing, or any sort of formal APA hearing; rather,

FERC argues that it is enough to have a "paper" hearing where the *accused* bears the burden of proving that penalties are *not* warranted.  These and other significant differences between FERC's administrative procedures and the protections provided by judicial proceedings illustrate why Congress was correct to vest federal district courts with "exclusive jurisdiction of violations," rather than giving the Commission authority to adjudicate the validity of its own accusations and then impose its own penalties.  FERC's procedures for trying to adjudicate violations and the ways they diverge from judicial proceedings are described below.

68.     FERC's enforcement process begins when its Enforcement Staff open an investigation into potential NGA violations.  Enforcement Staff have the power to pursue enforcement investigations both informally and formally.  Revised Policy Statement on Enforcement, 123 FERC ¶ 61,156 at P 23 (2008) ("2008 Policy Statement").  If Enforcement Staff proceed informally, they can investigate potential violations through voluntary requests for information.  But "if compulsory process is required," the Commission may order initiation of a formal investigation, which gives FERC's Enforcement Staff subpoena powers.  *Id*. n.18.

69.     During both informal and formal investigations, Enforcement Staff regularly have off-the-record "candid back-and-forth discussions and oral briefings" with the Commissioners and their Advisory Staff regarding the merits, progress, and findings of Enforcement Staff's investigation.  Written Testimony of Larry R. Parkinson, Director, Office of Enforcement, FERC, Before the Energy and Commerce Committee, Energy and Power Subcommittee, U.S. House of Representatives, at 10–11 (June 3, 2015) ("Parkinson Written Testimony").  FERC's rules place no limits on *ex parte* communications during the period leading up to the Commission initiation of a public enforcement proceeding.  *Id.*  Moreover, no record is kept of these "candid back and forth discussions," *id*., which can take place over multiple years.

70.     If FERC's Enforcement Staff conclude that a violation has occurred, they will, "either orally or in writing," outline their "views, including both the relevant facts and legal theories" underlying their conclusions and invite a target to respond and provide additional information relevant to the Enforcement Staff's conclusion.  2008 Policy Statement at P 32.  This usually takes the form of a preliminary findings letter.

71.     If the target responds to the preliminary findings letter, Enforcement Staff are under no obligation to reply.  *Barclays Bank PLC*, 144 FERC ¶ 61,041 at P 18 (2013) ("In short, while OE [Office of Enforcement] Staff shall give consideration to the legal and factual arguments put forward by the subject of an investigation, it is under no obligation to provide any response.").

72.     In this matter, FERC's Enforcement Staff issued oral preliminary findings on March 2, 2017 and written preliminary findings on April 3, 2017, both of which were non-public.  Enforcement Staff alleged that Plaintiffs violated FERC's regulation setting forth the "[p]urpose and intent" of its rules implementing Section 7 of the NGA, 18 C.F.R. § 157.5(a)–(c), by failing to inform FERC that Plaintiffs purchased, and a year later removed, a house in Ohio. Plaintiffs submitted a written response to FERC's Enforcement Staff preliminary findings letter on May 3, 2017.  In that response, Plaintiffs explained why information concerning the purchase and subsequent demolition of the house was not related to Plaintiffs' work on the Rover Pipeline project, and Plaintiffs were therefore not required to provide that information to FERC under Section 7 of the NGA or Section 157.5 of FERC's regulations.  Plaintiffs also explained that they had every legal right to remove the house, and their plans for its removal were known to Ohio's State Historic Preservation Officer, who did not object.  Enforcement Staff did not come to grips

with Plaintiffs' explanations for why their conduct was forthright and how it complied with the NGA and its rules and regulations.

73.     Instead, FERC's Enforcement Staff caused a public "Notice of Alleged Violation" ("NAV") to be issued on July 13, 2017, which summarily alleged that Plaintiffs had violated Section 7 of the NGA and Section 157.5 of FERC's regulations.  An NAV is a short document, generally one page, that "identif[ies] the entity or entities that are the subject of the investigation, the time and place of the alleged conduct, and the rules, regulations, statutes or orders that staff alleges were violated and . . . a concise description of the alleged wrongful conduct."  Order Authorizing Secretary to Issue Staff's Preliminary Notice of Violations, 129 FERC ¶ 61,247 at P 1 (2009).  The details of such an investigation largely remain nonpublic.  *See* 18 C.F.R. § 1b.9.

74.     If Enforcement Staff continue to assert that a violation occurred, they will typically ask the Commission for settlement authority.   2008 Policy Statement at P 34.  Enforcement Staff admit that "the attorneys in the Office of Enforcement act as *counsel to the Commission*" and "provide candid advice to the Commissioners regarding settlement considerations during the investigative stage," including on the merits of the investigation.  Parkinson Written Testimony at 12 (emphasis added).  The Commissioners and their Advisory Staff thus engage in candid conversations about the facts and merits of investigated cases, litigation risks, and exposure.  Throughout the course of an investigation and any settlement discussions, Commissioners and their Advisory Staff provide Enforcement Staff with individual assessments of the strengths and weaknesses of a case, the relevant positions, and the applicable legal arguments.

75.     If, as happened here, Enforcement Staff do not agree to a settlement, they will send the target of the investigation a letter pursuant to 18 C.F.R. § 1b.19 (the "1b.19 Notice"),

formally notifying the target that the Office of Enforcement intends to recommend that the Commission initiate an enforcement action.  18 C.F.R. § 1b.19 ("In the event" the FERC Office of Enforcement "determines to recommend to the Commission that an entity be made the subject of a" FERC administrative hearing, "or that an entity be made a defendant in a civil action to be brought by the Commission," the FERC Enforcement Staff shall "notify the entity that" the Office of Enforcement "intends to make such a recommendation."); 2008 Policy Statement at P 35, n.24; *see also* Submissions to the Commission upon Staff Intention to Seek an Order to Show Cause, 123 FERC ¶ 61,159 (2008).  The recipient of the 1b.19 Notice has 30 days to respond.  18 C.F.R. § 1b.19.

76.    FERC's Enforcement Staff issued a non-public 1b.19 Notice in this matter on April 3, 2018, stating that Enforcement Staff will recommend that the Commission issue an Order to Show Cause why Plaintiffs should not be made the subject of a public enforcement proceeding and be ordered to pay civil penalties for Plaintiffs' alleged violations of the NGA and related regulations.  On June 15, 2018, Plaintiffs submitted their response to the 1b.19 Notice.

77.    If a response to a 1b.19 Notice does not persuade Enforcement Staff to terminate the investigation, Enforcement Staff will send the Commission the 1b.19 Notice, the response, and a report recommending that the Commission initiate an enforcement action against the respondent.  2008 Policy Statement at P 35.

78.    The Commission invariably responds to such an Enforcement Staff transmittal by issuing an Order to Show Cause.  *Id.* at P 37.  Plaintiffs are aware of no contested case under any of the three main statutes FERC administers in which the Commission declined to issue an Order to Show Cause after Enforcement Staff recommended one.  This is unlike other agencies such as

31

the SEC, which between September 2010 and September 2012 declined to take enforcement action against twenty percent of individuals and companies that received a Wells Notice (the SEC's equivalent of a 1b.19 Notice), *see* Jean Eaglesham, *SEC Drops 20% of Probes After 'Wells Notice'*, Wall St. J. (Oct. 9, 2013), http://www.wsj.com/articles/ SB10001424052702304500404579125633137423664.  FERC's consistent practice is to adopt the recommendations of its Enforcement Staff by issuing an Order to Show Cause.  Indeed, according to the Enforcement Staff, "virtually all of [FERC's] enforcement matters," including "issuing orders to show cause or other orders, have been virtually all unanimous."  Oral Testimony of Larry R. Parkinson, Director, FERC Office of Enforcement, Discussion Draft on Accountability and Department of Energy Perspective on Title IV: Energy Efficiency, at 20–21 (June 3, 2015), http://docs.house.gov/meetings/IF/IF03/20150603/103551/HHRG-114-IF03-Transcript-20150603.pdf ("Parkinson Oral Testimony").  This case was no different:  FERC issued an Order to Show Cause to Plaintiffs on March 18, 2021.  It directed Plaintiffs to show cause why they should not be found to have violated an NGA regulation.  18 C.F.R. § 157.5.  (It did not require them to refute a violation of the NGA itself, however.  *Compare Rover*, 174 FERC ¶ 61,208 at P 1, 6(A) (alleging only Section 157.5 violation), *with id.* at 47–48 (noting that the "Notice of Alleged Violation" also alleged "that Rover violated section 7 of the NGA").)

79.    The Order to Show Cause triggers, for the first time in the process, a limit on *ex parte* communications between investigative and adjudicative staff, but that limitation is incomplete.  FERC claims that, during what it calls the adjudicative stage, Enforcement Staff members who are "assigned to work upon the proceeding or to assist in the trial" may not "participate or advise as to the findings, conclusion or decision" of the Commission and its ALJs. 18 C.F.R. § 385.2202.  But that leaves Enforcement Staff and Advisory Staff members *not*

assigned to prosecutorial roles in the upcoming proceeding free to continue advising the Commissioners—even if those Staff were involved at the investigative stage.

80.     Further, according to FERC, a Commission Order to Show Cause shifts the burden to the recipients to prove that they did not commit the alleged violation.  *See, e.g.*, *Rover*, 174 FERC ¶ 61,208 at P 1 (directing Rover "to show cause why it should not be found to have violated Section 157.5 of the Commission's regulations" by allegedly "misleading the Commission in its Application for Certificate of Public Convenience and Necessity under section 7(c) of the Natural Gas Act (NGA)," and to further "show cause why it should not be assessed civil penalties in the amount of $20,160,000").  Although FERC "emphasizes that, in issuing an Order to Show Cause, it does not make any finding as to whether there has been a violation of the law," 2008 Policy Statement at P 37, FERC's position is that an Order to Show Cause requires the recipient to overcome the Commission determination that the Office of Enforcement "has presented sufficient evidence to establish a prima facie case" of an NGA violation.  *Total Gas & Power North America, Inc., et al.*, 176 FERC ¶ 61,026 at P 29 (Order Establishing Hearing).

81.     The recipient of an Order to Show Cause must file an answer within 30 days, 18 C.F.R. § 385.213 (2020), in which it can agree to "pay the proposed assessment or contest the allegations" made by FERC's Enforcement Staff, *Rover*, 174 FERC ¶ 61,208 at P 5.

82.     Despite Congress's unambiguous grant to federal district courts of exclusive jurisdiction over alleged violations of the NGA, FERC's consistent practice upon receiving a respondent's answer is not to bring its enforcement action for alleged violations in federal court.  Instead, FERC states that it "may assess a civil penalty" without any hearing at all.  *Id.*  In those cases where FERC decides to order a hearing, it "will issue a hearing order and indicate whether

the Commission will conduct a paper hearing or a hearing before an" ALJ to "determine whether a violation or violations occurred." *Id.*  If an ALJ conducts an administrative hearing and finds a violation, the ALJ "will recommend [an] appropriate penalty." *Id.*

83.     Plaintiffs obtained an extension of time for their answer to FERC's Order to Show Cause and submitted it on June 21, 2021, once more explaining why no violation of the NGA occurred and why FERC's administrative adjudication process violates Section 24 of the NGA (15 U.S.C. § 717u) and the Constitution.

84.     Notwithstanding Section 24's express language vesting "exclusive jurisdiction of violations" in the federal district courts, and despite the absence of any statutory option for the Commission to adjudicate violations (as the FPA allows upon the consent of the accused), FERC takes the position that it can use its ALJs to "adjudicate[e]" violations, including the appropriate penalties, without honoring the "exclusive" jurisdiction of federal district courts.  *See ETP*, 123 FERC ¶ 61,168 at P 13 (2008) (setting enforcement action for administrative hearing before an ALJ); *ETP*, 124 FERC ¶ 61,149 at P 6 (2008) (rejecting ETP's contention that "the Commission is not authorized to compel adjudication of ETP's potential civil penalty liability for NGA . . . violations in a trial-type hearing on the merits before an ALJ"); *Amaranth Advisors L.L.C.* ("*Amaranth*"), 120 FERC ¶ 61,085 at P 4 n.7 (2007) (ruling that the Commission may "set specified issues for a trial-type hearing . . . before an administrative law judge (ALJ)"); *BP*, 144 FERC ¶ 61,100 at P 3 ("If BP chooses to contest the order or the proposed assessment, the Commission . . . will issue a hearing order and indicate whether the Commission will conduct a paper hearing or a hearing before an ALJ."); *Total*, 176 FERC ¶ 61,026 at P 21 ("establishing a hearing before an ALJ").  Indeed, just this year, FERC affirmatively "reject[ed] [the] contention that NGA section 24 gives federal district courts *exclusive jurisdiction* to determine violations of

the NGA," *Total*, 176 FERC ¶ 61,026 at P 17 (emphasis added)—even though that is the statute's express language.

85.    Consistent with this unlawful practice, FERC issued an order on January 20, 2022 finding that Enforcement Staff has made out a *prima facie* case that Plaintiffs violated the NGA and establishing a hearing before an ALJ, rather than filing an action in federal district court. *See Rover Pipeline, LLC, et al.*, 178 FERC ¶ 61,028 (2022).  FERC's chief ALJ has assigned the matter to a presiding ALJ, setting a schedule requiring that the hearing be convened within 32 weeks (September 6, 2022) and the initial decision issued within 47 weeks (December 20, 2022) of the issuance of the order setting a schedule, and requiring the presiding ALJ to convene a prehearing conference by Friday, March 11, 2022.  *See* Order Of Chief Judge Designating Administrative Law Judge And Establishing Track II Schedule, Rover Pipeline, LLC and Energy Transfer Partners, L.P., FERC Dkt. No. IN19-4-000 (issued January 25, 2022) ("January 25 Order").

86.    Under this policy and practice, an ALJ will conduct a hearing and render an "Initial Decision."  Then the Commission—the very entity that oversaw the investigation and had candid back-and-forth, off-the-record conversations with Enforcement Staff prosecutors on the merits of the case—will "consider the Initial Decision of the ALJ and any exceptions filed." 2006 Policy Statement at P 7.4.  "[I]f the Commission determines that there is a violation, the Commission will issue an order and may assess any appropriate penalty." *Id*.

87.    FERC insists that aggrieved parties must then submit to rehearing by the Commission before seeking judicial review. *Rover*, 174 FERC ¶ 61,208 at P 5.  FERC also takes the position that Commission orders to pay civil penalties under the NGA are subject to only deferential review in a federal court of appeals under Section 19(b) of the NGA, 15 U.S.C.

§ 717r(b).  *See* 2006 Policy Statement at PP 7.5–7.6.  Under FERC's view, therefore, the Commission's "finding[s] . . . as to the facts" are treated as "conclusive" "if supported by substantial evidence."  15 U.S.C. § 717r(b); *see also ETP*, 121 FERC ¶ 61,282 at P 65 n.120 ("NGA section 22 provides for Commission adjudication of NGA civil penalties followed by the court of appeals reviewing such Commission action under NGA section 19."); *id.* at P 66 (concluding that Congress "inten[ded] that the Commission's assessment of NGA section 22 civil penalties should be reviewed by a court of appeals rather than a federal district court"); *Amaranth*, 124 FERC ¶ 61,050 at P 77 (2008) ("[T]he Commission again concludes that Congress intended that the Commission's assessment of NGA section 22 civil penalties should be reviewed by a court of appeals rather than a federal district court." (quotation marks omitted)); *BP*, 144 FERC ¶ 61,100 at P 3 ("BP can appeal a final Commission order to a United States Court of Appeals within the appropriate time for review of a Commission order."); *Total*, 176 FERC ¶ 61,026 at P 171 (stating the Commission's position that "it is for the Commission to assess a civil penalty after notice and an opportunity for a hearing before an ALJ," and explaining that "a party aggrieved by a Commission order may seek rehearing of that Commission order and then seek review of such order in the court of appeals of the United States for the appropriate circuit").

88.     According to FERC, this review at the court of appeals is so deferential that its findings must be upheld so long as the Commission is able to point to "more than a mere scintilla" of evidence of a violation.  Under this view, the accused can be ordered to pay hundreds of millions of dollars even if the "preponderance of the evidence" shows that no violation occurred.  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Columbia Gas Transmission Corp. v. FERC*, 448 F.3d 382, 385 (D.C. Cir. 2006) (explaining that the

substantial evidence standard means "more than a scintilla, but . . . less than a preponderance of the evidence") (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002)).

89.     Under FERC's view, therefore, it can hold in-house administrative proceedings to conclusively "determine whether a violation or violations occurred," 2006 Policy Statement, P 7.3, and it may employ ALJs to "adjudicat[e]" violations and propose penalties, without a federal district court ever being involved in those determinations—despite such courts having *exclusive jurisdiction* of NGA violations, *see, e.g.*, *ETP*, 121 FERC ¶ 61,282, at P 65 n.120 ("NGA section 22 provides for Commission adjudication of NGA civil penalties followed by the court of appeals reviewing such Commission action under NGA section 19."); *Total*, 176 FERC ¶ 61,026 at P 174 ("NGA section 19 vests review of Commission orders in the Courts of Appeals, not the district courts.").

90.     "If the person fails to pay the civil penalty," FERC "will institute a collection action in an appropriate United States district court." 2006 Policy Statement at P 7.7; *Rover*, 174 FERC ¶ 61,208 at P 5. Indeed, it is FERC's position that the district court's "exclusive jurisdiction" conferred in Section 24 applies only to such "collection actions." *ETP*, 121 FERC ¶ 61,282 at P 58 ("The language of NGA section 24 indicates that the Commission would file in federal district court to pursue a collection action or an injunction, not to make a determination that a person violated the NGA."); *Total*, 176 FERC ¶ 61,026 at P 172 (stating FERC's belief that Section 24 "gives federal district courts jurisdiction over only discrete causes of action such as criminal violations, suits for injunctive relief, and enforcement of final judgments"); *Rover*, 178 FERC ¶ 61,028 at P 38 (same). This view, which makes a mockery of the exclusive jurisdiction of "*violations*" that Congress conferred on the federal district courts and instead

relegates those courts to the role of passive enforcers of the Commission's edicts, is completely contrary to the text, structure, and history of the NGA, and constitutes an unadulterated usurpation of judicial authority by the agency.

## III.  FERC ALJs Are Officers With Broad And Substantial Power.

91.  As noted earlier, if FERC orders a hearing to establish an alleged NGA violation, an ALJ conducts it.  FERC's Chairman appoints its ALJs (also known as hearing examiners). *See* 42 U.S.C. § 7171(c) ("The Chairman shall be responsible on behalf of the Commission for . . . the appointment and employment of hearing examiners . . . ."); 18 C.F.R. § 376.105(b) ("The Chairman is responsible on behalf of the Commission for . . . the appointment and employment of Administrative Law Judges . . . .").

92.  The Chairman appoints ALJs based on need.  5 U.S.C. § 3105 ("Each agency shall appoint as many administrative law judges as are necessary for proceedings required to be conducted in accordance with sections 556 and 557 of this title.").  By regulation, ALJs may be appointed only from a list of eligible candidates provided by the Office of Personnel Management ("OPM") or with prior approval of OPM.  5 C.F.R. § 930.204.

93.  FERC ALJs receive career appointments, rather than time-limited terms, and they are exempt from probationary periods that apply to certain other government employees.  5 C.F.R. § 930.204(a).  FERC ALJs also receive substantial tenure protections.  Under the APA, FERC ALJs may be removed only for "good cause established and determined by the Merit Systems Protection Board" ("MSPB").  5 U.S.C. § 7521(a).  Members of the MSPB, in turn, may not be removed except for "inefficiency, neglect of duty, or malfeasance in office."  *Id.* § 1202(d).  In addition, FERC Commissioners themselves receive removal protection, and "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office."  42 U.S.C. § 7171(b)(1).

38

94.     The salary of FERC ALJs is specified by statute.  There are eight levels of basic pay for ALJs, the lowest of which may not be less than 65% of the rate of basic pay for level IV of the Executive Schedule, and the highest of which may not be more than the rate of basic pay for level IV of the Executive Schedule.  5 U.S.C. § 5372.  The Executive Schedule is a system of salaries given to the highest-ranked appointed positions in the executive branch of the U.S. government.  *Id.* § 5311.

95.     FERC ALJs are vested with broad discretion to exercise significant authority over administrative proceedings.  Under the FERC Rules of Practice and Procedure, a FERC ALJ— referred to in the Rules of Practice and Procedure as the "presiding officer"—is empowered to perform the following functions within his or her discretion, among others:

   a.     "[D]etermine whether a violation or violations occurred," 2006 Policy Statement at P 7.3;

   b.     Regulate the course of the proceeding, Rules of Practice and Procedure 504(b)(1);

   c.     Rule on and receive evidence, Rules of Practice and Procedure 504(b)(4);

   d.     Issue subpoenas and order the production of materials in discovery, Rules of Practice and Procedure 504(b)(6);

   e.     Rule on and dispose of procedural matters, including written and oral motions, Rules of Practice and Procedure 504(b)(8);

   f.     Summarily dispose of a proceeding or part of a proceeding, Rules of Practice and Procedure 504(b)(9); and

   g.     Rule on motions to intervene, Rules of Practice and Procedure 504(b)(12).

IV.   **FERC Administrative Proceedings Differ Markedly From District Court Proceedings.**

96.   An administrative proceeding before a FERC ALJ is markedly different from a civil action litigated in federal court where substantial penalties may result.

97.   In contrast to matters in federal court, a respondent in a FERC administrative proceeding has no opportunity for a jury trial.  Instead, a FERC ALJ, who makes conclusions of law, also serves as the finder of fact.

98.   FERC administrative hearings are more truncated than most civil actions in federal court.  FERC's Rules of Practice and Procedure generally require the administrative hearing to take place, at most, forty-two weeks from the issuance of an order instituting proceedings.  In its discretion, FERC can require that the hearing occur within less than twenty weeks of the order instituting proceedings.

99.   Unlike how proceedings occur in federal court, FERC has decided not to apply the Federal Rules of Civil Procedure or the Federal Rules of Evidence to its administrative proceedings.  Instead, any "evidence of the kind which would affect reasonable and fair-minded persons in the conduct of their daily affairs" is admissible, including hearsay, as long as the ALJ decides it is not irrelevant, immaterial, or unduly repetitious.  18 C.F.R. § 385.509(a).

100.   This low standard for admissibility has permitted a variety of evidence to be introduced into the record against alleged NGA violators that federal courts would exclude.  For example, in an enforcement case heard before a FERC ALJ, Enforcement Staff were permitted to introduce hearsay evidence through the testimony of its expert witness.  Order Denying BP's Motion to Strike Witness Disclosures at P 6, *BP*, Docket No. IN13-15-000 (Oct. 30, 2014) ("Staff is permitted to include investigative testimony for the purpose of [staff's witnesses] forming their own expert testimony under Federal Rule of Evidence 703.").

101.  The broad discretion that FERC ALJs exercise under that agency's Rules of Practice and Procedure further contribute to the unlevel playing field by allowing Enforcement Staff to exclude relevant evidence proffered by an accused party that would be admissible in a federal court.  For example, the presence of an effective compliance program is a mitigating factor in FERC's assessment of penalties for alleged violations.  In that same enforcement case heard before a FERC ALJ, however, the ALJ refused to admit, as an admission by a party opponent, the Enforcement Staff's statements that the alleged violator had a compliance program that reflected the applicable industry practices.  *BP*, 152 FERC ¶ 63,016 at P 240 (2015) (ALJ Initial Decision).  According to the ALJ, this evidence was not admissible as an admission by a party opponent because the statements were made during the course of the investigation and "previous investigatory positions are not admissions of a party opponent."  *Id.* The admissibility of evidence in FERC administrative hearings thus often appears to depend more on *which party*—the Enforcement Staff or the accused—is seeking to submit the evidence in question than on the Commission's evidentiary rules.

102.  Basic procedural safeguards afforded to parties in federal court litigation are lacking in proceedings before a FERC ALJ.  In *BP*, for example, FERC's Enforcement Staff were able to avoid producing a privilege log of documents withheld during discovery—despite the requirement in FERC's own regulations, 18 C.F.R. § 385.410(d)(2)(i), of a specific, written claim of privilege—because it would have been "unduly burdensome and it would take staff resources away from preparing for the hearing."  Order Confirming Ruling at P 7, *BP*, Docket No. IN13-15-000 (July 3, 2014).  The ALJ in that same case also shifted the burden of proof to the accused to prove it did not commit a violation.  *See BP*, 152 FERC ¶ 63,016 at P 38 (finding

that "BP did not have a valid justification and did not explain the increases in [its] financial positions").

103.  As explained above, "appeals" from FERC ALJ decisions are heard by the FERC Commissioners themselves—the very persons who, along with their Advisory Staff, often have a multi-year history of candid back-and-forth discussions with Enforcement Staff on the case's merits before initially determining that the enforcement action is warranted.  *See* FERC Rules of Practice and Procedure 711.  It is as if the U.S. Attorney who participated in the decision to seek an indictment later sits as a judge reviewing a conviction on the charges in the same indictment.  By statute, an appeal of a final Commission order is made to a United States Court of Appeals, with deferential review.  *See* 15 U.S.C. § 717r(b) (adding that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive").

**RIPENESS**

104.  Plaintiffs' challenge to FERC's unlawful administrative adjudicatory procedures is ripe for this Court's adjudication.  First, by issuing its Order Establishing Hearing in this case, *see* 178 FERC ¶ 61,028, and by issuing an additional order assigning the matter to an ALJ, setting a schedule for the administrative process, and ordering a preconference hearing, *see* January 25 Order, FERC has already violated, and will continue to violate, Section 24 of the NGA and Plaintiffs' statutory right to have a district court adjudicate FERC's allegations, with all the procedural protections and rights that such a civil action entails.  Thus, the violation of which Plaintiffs complain is not speculative—it has already occurred.  Second, and independently, Plaintiffs have already been injured, and will continue to be injured, by being forced to bear the burdensome costs of defending themselves in an *ultra vires* administrative

proceeding where the stakes established by FERC are the imposition of a legally binding penalty.

105.    When it issued its Order Establishing Hearing, FERC exceeded its statutory authority by initiating an administrative adjudication that Congress did not authorize.  Section 22(b) of the NGA provides that FERC is to "assess[]" a penalty "after notice and opportunity for public hearing."  15 U.S.C. § 717t-1(b).  Under the procedures that FERC follows based on identical language in the FPA, the Commission provides this "notice and opportunity for public hearing" when it issues an order to show cause.  That order—which initiates what FERC calls an "adversarial proceeding" at the agency—triggers a respondent's opportunity to answer Enforcement Staff's allegations and submit evidence explaining why Enforcement Staff is wrong.  *See Maxim* Show Cause Order at P 6(D) ("notice" in FPA case); *Maxim* FERC Memorandum at 7 ("adversarial proceeding").  FERC also permits Enforcement Staff to reply to a respondent's answer.  After that, by statute, the Commission "shall" assess a penalty if it believes the violation has occurred, thus concluding the administrative part of the process.  16 U.S.C. § 823b(c) (FPA provision); 15 U.S.C. § 717t-1(b) (NGA provision with identical relevant text).

106.    Because FERC issued its Order to Show Cause (on March 18, 2021), received Plaintiffs' Answer (on June 21, 2021), and then ordered (on January 20, 2022) that the matter will proceed to a hearing where the alleged violations are litigated, the NGA authorizes no further administrative proceedings.  FERC's own actions in other matters show that the Commission has done everything prefatory to issuing its order formally assessing its proposed penalty.  And FERC's January 20, 2022 Order Establishing Hearing in this matter "establishes a hearing to determine whether" Plaintiffs "violated section 157.5 of the Commission's

regulations."  178 FERC ¶ 61,028 P 1; *id.* at P 98 (ALJ should "determine whether Respondents made misrepresentations or omissions to the Commission and, if so, whether those misrepresentations and omissions constitute a violation of section 157.5 of the Commission's regulations").  By initiating adjudication of the alleged violations by an ALJ rather than a federal district judge, FERC has already violated Section 24 and thus made Plaintiffs' claims ripe for this Court's adjudication.

107.   The Supreme Court has made clear that "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007).  Here, of course, FERC has not merely threatened to enforce the NGA at some unspecified future date; it has already initiated a proceeding before an ALJ to enforce that statute, adjudicate liability, and then exact civil penalties, all in violation of Section 24.

108.   The dispute between Plaintiffs and Defendants has thus come to a head.  The next step in the process that FERC has initiated is a hearing at which an official will hear from the parties and adjudicate whether Plaintiffs violated FERC rules and the NGA.  178 FERC ¶ 61,028 P 18 (ALJ proceeding will be a "trial-type hearing" to "resolv[e] disputes about material facts" and, if needed, "ascertain the credibility of the witnesses" (internal quotation marks and citations omitted)).  FERC insists that this hearing can be conducted by a FERC ALJ.  Plaintiffs argue instead that federal law—both statutory and constitutional—requires that the hearing be in federal district court.  The time is ripe to resolve that disagreement.

109.   FERC's position here also is not in doubt.  It has continuously maintained that it has jurisdiction to conclusively adjudicate its own allegations that Plaintiffs and others violated

the NGA.  *See, e.g.*, *Total Gas & Power N. Am., Inc. v. Fed. Energy Regul. Comm'n*, No. CV 4:16-1250, 2016 WL 3855865, at *11 (S.D. Tex. July 15, 2016), *aff'd on ripeness grounds*, 859 F.3d 325 (5th Cir. 2017), as revised (July 10, 2017) (FERC arguing that "the FERC administrative process coupled with judicial review in a United States court of appeals provides the sole avenue for Plaintiffs to press their statutory and constitutional claims"); *see also* 2006 Policy Statement at P 7 (FERC erroneously stating that "The NGA civil penalty process does not include the possibility for the person to receive a *de novo* review in district court, because there is no statutory provision permitting *de novo* review").[3]  Indeed, in an order issued just six months ago, FERC stated affirmatively that it "reject[s] [the] contention that NGA section 24 gives federal district courts *exclusive jurisdiction* to determine violations of the NGA."  *Total*, 176 FERC ¶ 61,026 at P 17 (emphasis added).  In this very matter, FERC has reiterated that position.  178 FERC ¶ 61,028 at P 38 (rejecting the argument that "the phrase in NGA section 24—'the District Courts . . . shall have exclusive jurisdiction of violations of this chapter'— deprives the Commission of the power to adjudicate violations and assess penalties").  In *Total*, FERC rejected arguments that its administrative proceedings are constitutionally improper under the Appointments Clause, Article III, and the Fifth and Seventh Amendments.  FERC has taken the same position on these issues in this proceeding, expressly relying on its order in *Total*.  *See Rover*, 174 FERC ¶ 61,208 at P 1 (Order to Show Cause); *Rover*, 178 FERC ¶ 61,028 at PP 60–69, 73–79, 84–92 (Order Establishing Hearing).

---

[3]  The issue here is not whether the standard of review of FERC's penalty assessment should be *de novo*.  Rather, it is whether the penalty has any force of law before the district court makes an independent determination pursuant to Section 24 of the NGA that a violation has occurred, as in the FPA.

110.    FERC's *ultra vires* actions, if left unchecked, will require Plaintiffs to expend substantial resources participating in a FERC administrative proceeding that Section 24 of the NGA forecloses.  This is not an "abstract disagreement[]" of which "the ripeness doctrine precludes premature adjudication"—it is instead a "'fully crystalized' dispute[]." *VanderKam v. VanderKam*, 776 F.3d 883, 888 (D.C. Cir. 2015) (citation omitted).  By initiating its improper administrative proceeding against Plaintiffs and setting the matter for a hearing before an ALJ, FERC has already caused injury to Plaintiffs that creates "a substantial controversy . . . of sufficient immediacy and reality." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  Nothing more is required for a claim under the Declaratory Judgment Act to be ripe. *Id.*

111.    This action is also ripe for a different reason:  Plaintiffs will suffer immediate and ongoing injury from being forced to expend significant resources to defend themselves if forced through an unlawful administrative adjudication of the alleged violations.  These are resources Plaintiffs would not otherwise need to expend if their claims here prevail.  It is well-established that the "concrete cost of an additional proceeding is a cognizable Article III injury." *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 648 (D.C. Cir. 1998); *J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646 (7th Cir. 2014) (holding that a bank had standing to enforce a forum-selection clause that it argued barred an ongoing arbitration even before that arbitration concluded because the bank agreed to "foot the bill" for litigation expenses); *Farrell Lines Inc. v. Ceres Terminals Inc.*, 161 F.3d 115, 116 (2d Cir. 1998) (per curiam) (affirming "for substantially the same reasons" a district court's holding in a declaratory action that a forum selection dispute presented a justiciable "actual controversy").  Indeed, the Supreme Court has explained that the hardship—*i.e.*, the additional burden and expense—of having to submit to an

46

"ultra vires proceeding" is a cognizable injury ripe for adjudication. *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 n.2 (2010) (holding that an action challenging class arbitration was ripe because "[t]he arbitration panel's award means that petitioners must now submit to class determination proceedings before arbitrators who, if petitioners are correct, have no authority to require class arbitration").

112.   Even assuming, contrary to the explanation above, that FERC has some basis for conducting further administrative proceedings under a proper reading of the NGA, the costs to Plaintiffs of defending themselves before the agency in a proceeding that, under FERC's view, purports to adjudicate the alleged violations will be significantly higher than in some other type of agency proceeding where tens of millions of dollars in potential liability are not at stake. FERC intends to conduct an administrative proceeding before an ALJ that serves as Plaintiffs' sole chance to (1) engage in discovery, (2) confront FERC's witnesses, and (3) build the factual record for an appeal that will be subject solely to deferential review.[4]   Thus, without the relief sought in this Complaint, Plaintiffs will need to mount a vigorous and complete defense before the ALJ that discloses Plaintiffs' entire defense strategy to FERC.

113.   By contrast, if Plaintiffs prevail on their claims here, FERC may conduct—at most—a preliminary investigative proceeding to refine its allegations, as it does under the FPA. The result would lack binding force, instead merely establishing the predicate, in the form of proposed penalties, for filing a lawsuit in federal district court.  In such circumstances, Plaintiffs

---

[4]  Reinforcing that FERC's position would force Plaintiffs to engage in all of their discovery at the agency level, FERC has argued even in those FPA actions where the respondent elects a district court proceeding that discovery must be conducted while the matter is before the Commission or not at all.  *See, e.g.*, *FERC v. Silkman*, 233 F. Supp. 3d 201, 210 (D. Me. 2017) (noting that FERC's position is that no discovery should be allowed in district court); *Maxim Power*, 196 F. Supp. 3d at 189 (FERC arguing that "de novo review" in the district court does not " require[e] a trial and the attendant procedures," such as discovery).

would *not* need to mount a complete defense; instead, they would be able to reserve that expenditure of resources and disclosure of defense strategy for the action that FERC would need to file in district court.  For example, Plaintiffs would not need to cross-examine FERC's witnesses as extensively (or even at all) in a proper administrative hearing, nor would Plaintiffs need to put on their own witnesses.  This would spare Plaintiffs the expenditure of significant resources on preparation because such a proceeding would *not* result in a legally binding penalty—*i.e.*, it would be no more than a preliminary proceeding.  Nor would Plaintiffs need to reveal their defense strategy to FERC until the dispute reached federal district court.  Instead, the main event would be the district court action that FERC would be required to file pursuant to Section 24, and Plaintiffs would be able to preserve their resources and reserve their strategy for that litigation.

114.   Experience under the FPA proves the point.  Recall that FPA respondents may elect between a formal agency adjudication of violations in an ALJ hearing, or an adjudication in federal district court.  FERC itself has conceded that the former—the very type of ALJ adjudication that FERC plans to conduct here, "with review by a federal appeals court"—"is likely to be *more costly*" than its streamlined "adversarial proceeding before the Commission itself," where the Commission merely assesses its proposed penalty for later federal court adjudication.  *Maxim* FERC Memorandum at 23 (emphasis added).  FERC concedes that the more abbreviated agency proceeding that doesn't seek to adjudicate alleged violations is "likely to be *less costly*" than what FERC proposes to put Plaintiffs through here, even if the abbreviated agency proceeding is "followed by review in federal District Court."  *Id.* (emphasis added).

115.    An analogy to criminal law is instructive.  In most jurisdictions the government cannot proceed with a felony prosecution until it establishes probable cause to believe that the defendant committed the charged offense.  In many states, that demonstration occurs at a "preliminary hearing," where a judge or magistrate decides whether the government's evidence is sufficient to require the defendant to stand trial.  Because a trial will follow, the defense is free to refrain from presenting a defense case or even an argument at such a preliminary hearing.  For example, the Supreme Court has explained with reference to one State's use of this type of procedure that "[a]t the preliminary hearing . . . the accused is not required to advance any defenses, and failure to do so does not preclude him from availing himself of every defense he may have upon the trial of the case."  *Coleman v. Alabama*, 399 U.S. 1, 8 (1970) (quoting *Coleman v. State*, 44 Ala. App. 429, 433 (Ala. Ct. App. 1968)); *see also United States v. Shields*, No. 04-20254, 2009 WL 10714753, at *1 (W.D. Tenn. Aug. 17, 2009) (explaining that "[t]he purpose of a preliminary hearing is to determine the existence of probable cause for further proceedings").  Thus, a criminal defendant usually will not put on a full defense at a preliminary hearing, thus conserving resources, saving arguments for trial, and preventing the government from prematurely learning the defense strategy.

116.    So too here.  If Plaintiffs prevail in their claim that Section 24 requires FERC to prove in district court that Plaintiffs are liable for violating the NGA or its regulations, then Plaintiffs would not need to expend their resources defending against FERC's allegations in an administrative proceeding that cannot result in a legally binding penalty.  Thus, Plaintiffs suffer injury by being forced to participate in an unlawful administrative proceeding.  By issuing its Order Establishing Hearing and forcing Plaintiffs to mount a complete defense before an ALJ, FERC has required Plaintiffs to bear a significant additional litigation burden and expend costs

that they would otherwise not need to spend.  FERC further has required Plaintiffs to reveal their full defense strategy before FERC files its district court complaint alleging violations. Such injuries make the dispute ripe.  *See Stolt-Nielsen*, 559 U.S. at 671 n.2; *Sea-Land*, 137 F.3d at 648.

117.   This conclusion—that the claims are ripe—is unaffected by the Fifth Circuit's reasoning in *TOTAL Gas & Power N. Am., Inc. v. FERC*, 859 F.3d 325 (5th Cir. 2017), *as revised* (July 10, 2017).  That court upheld dismissal of a company's Declaratory Judgment Act challenge to FERC's unlawful administrative adjudication process on ripeness grounds, explaining that FERC had not yet issued a final order at the conclusion of that unlawful process. The procedural posture here is different, though, because an Order Establishing Hearing had yet to issue in *TOTAL*.  The Fifth Circuit, sitting en banc, recently distinguished *TOTAL*'s ripeness ruling on exactly that ground.  In *Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021), the plaintiff also sought a declaratory judgment that the agency proceeding she faced was unlawful.  The en banc court held that *TOTAL* did not require dismissal on ripeness grounds because, unlike in *TOTAL*, the agency in *Cochran* had proceeded to the step of setting the matter for a hearing.  *Id.* at 213 (explaining that in *TOTAL* "FERC had not actually scheduled a hearing before an ALJ prior to the plaintiffs filing suit," but the SEC "has already assigned Cochran's case to an ALJ," and therefore "her risk of hardship is substantially more concrete than in *TOTAL*").  *Id.* Likewise here, FERC has already assigned Plaintiffs' case to an ALJ, *see* January 25 Order, and thus made Plaintiffs' risk of hardship at least as concrete as the risk in *Cochran*.

118.   Furthermore, even on its own terms, *TOTAL* is unsound.  The reasoning rests on two erroneous premises:  (1) that administrative adjudicatory proceedings before an ALJ are the type of "public hearing" that Section 22 allows, and (2) that any harm to a plaintiff from being

required to participate in the administrative adjudication by FERC is necessarily speculative. *See TOTAL*, 859 F.3d at 338.  First, as explained above, FERC's administrative adjudication before an ALJ is *not* the type of investigative hearing FERC is authorized to hold.  Instead, the NGA allows FERC to undertake an administrative process similar to that under the FPA—an investigation phase, followed by an "adversarial" phase consisting of the Commission's Show Cause order and a respondent's Answer in order to satisfy Section 22's "notice" and "public hearing" requirements.  Thus, when the Fifth Circuit concluded "that FERC is authorized to conduct a proceeding regarding the alleged violation and penalty prior to any action being brought in the district court," *id.*, that court confused the type of proceeding FERC is permitted to conduct with the type that FERC improperly seeks to pursue here.  FERC may conduct an investigation, issue a Show Cause order, consider respondent's response, and assess a penalty. *See* 15 U.S.C. § 717t–1(b).  But FERC is *not* authorized to conduct the adjudicatory proceeding it has ordered Plaintiffs to participate in here.  The Order Establishing Hearing makes clear that the investigative phase has already ended and that the ALJ hearing will be part of the adjudicative phase.  178 FERC ¶ 61,028 P 30 (rejecting statute of limitations defense because "the Show Cause Order commenced an adversarial, adjudicative process").  Such a proceeding would therefore be "additional," *Sea-Land Serv.*, 137 F.3d at 648, and "*ultra vires*," *Stolt-Nielsen*, 559 U.S. at 671 n.2.  Even assuming *arguendo* that the decision in *TOTAL* could be defended, that case was brought before FERC issued an order establishing the type of ALJ proceeding that would follow.  But, as explained above, here FERC has taken *every* permissible step before assessing its penalty, and it has ordered—as the next step—the very ALJ proceeding that the NGA forbids when adjudicating violations.  Thus, just like the challenge in *Cochran*, Plaintiffs' lawsuit is ripe.

119.    The Fifth Circuit's second premise fares no better, and again is distinguished on the facts here in any event.  As explained above, the injury to Plaintiffs is far from speculative; it has already occurred and continues to occur because, in contrast with *TOTAL*, FERC has already violated Section 24 by beginning a proceeding against Plaintiffs that the NGA reserves to federal district courts.  That requirement imposes an additional cost burden on Plaintiffs by forcing them to mount a full defense when the only agency proceeding the law authorized was the preliminary one that allowed Plaintiffs to conserve their resources for litigation in the district court.  The Fifth Circuit's explanation that "the expense and annoyance of litigation, though substantial, is part of the social burden of living under government," *TOTAL*, 859 F.3d at 338, is therefore inapposite.  Plaintiffs are not being put through expenses and burdens of litigation that could occur even if they prevail in this lawsuit.  Rather, the additional expense and burden of being forced to mount a full defense in an agency proceeding that the law (Section 24) prohibits *is* an injury that satisfies the requirements for ripeness.  *See Stolt-Nielsen*, 559 U.S. at 671 n.2; *Sea-Land*, 137 F.3d at 648.

## GROUNDS FOR DECLARATORY RELIEF

I.    **Plaintiffs Face An Imminent Violation Of Their Rights Because The NGA Grants District Courts Exclusive Jurisdiction To Adjudicate Violations Of The NGA.**

120.    "From the earliest history of the government, the jurisdiction over actions to recover penalties and forfeitures has been placed in the district court." *Lees v. United States*, 150 U.S. 476, 478–79 (1893).  Where "a statute imposes a penalty and forfeiture, jurisdiction of an action therefor[e] . . . vest[s] in the district court, unless it is *in express terms* placed *exclusively* elsewhere." *Id.* at 479 (emphases added).

121.    The NGA does not authorize FERC to adjudicate whether Plaintiffs violated the NGA.  To the contrary, as noted earlier, Section 24 of the NGA (codified in chapter 15B of

Title 15 of the U.S. Code) states that federal district courts "shall have *exclusive jurisdiction of violations of* this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder."  15 U.S.C. § 717u (emphasis added).  This provision expressly requires FERC to bring its enforcement action in federal district court to adjudicate whether Plaintiffs committed "violations" of the NGA, and whether any "liability," such as a monetary penalty, should be imposed upon them for such violations.

122.   As explained above, since the 1930s, Congress has vested federal district courts with "exclusive jurisdiction" of "violations" of, and "liabilities" created by, the NGA.  When Congress added civil penalty authority under the NGA and the FPA, it gave FERC a limited power:  to determine the amount of the "*proposed* penalty," "after notice and opportunity for public hearing."  15 U.S.C. § 717t-1(c) (emphasis added); 16 U.S.C. § 823b(c).  Congress has not altered the statutory language granting federal district courts this exclusive jurisdiction. Indeed, apart from two explicit exceptions found only in the FPA—one for violations of a narrow class of orders, and the other triggered only by the election or inaction of the accused— nothing in these statutes grants FERC authority to adjudicate violations or impose final penalties through an in-house process.

123.   When Congress amended the NGA by enacting EPAct 2005, it did not alter the exclusive power of district courts to adjudicate alleged NGA violations.

124.   EPAct 2005's "legislative history, for those who care about it," *Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J., dissenting), confirms this.  Senator Domenici was chairman of the Senate Energy Committee when EPAct 2005 amended the NGA to give FERC

enhanced authority to bring NGA enforcement actions.  He has explained that the NGA process

for establishing violations and imposing penalties was intended to be consistent with the

preexisting vesting of exclusive jurisdiction in the federal district courts to adjudicate violations

under the other statutes administered by FERC—the NGPA and the FPA:

> Mr. Cornyn:  . . .  Did [EPAct 2005] bring about any change in the standards of review
> which would attach to enforcement proceedings under these new authorities?

> Mr. Domenici:  . . .  [T]here was no intent to change the standard of review which would
> attach to any enforcement proceeding.  *The longstanding practice has been for the
> accused party to have rights to a de novo review of the charges in Federal court.  Such
> rights are necessary to ensure that the agency does not act as both prosecutor and judge
> in any enforcement proceeding.*  That right is clear, not just in the case law but in other
> statutes administered by the FERC, including the Federal Power Act and the Natural Gas
> Policy Act.  *There is no suggestion and there can be no inference that we intended to
> change that standard with our enhanced market oversight provisions in the Natural Gas
> Act.*

154 Cong. Rec. S9468 (daily ed. Sept. 25, 2008) (emphases added).

125.   This legislative history further confirms Plaintiffs' interpretation of Section 24

(i.e., it "puts extra icing on a cake already frosted," *Yates*, 574 U.S. at 557 (Kagan, J.,

dissenting)).  By contrast, FERC's directive to submit to an administrative hearing before an

ALJ who adjudicates alleged NGA violations—followed (in the Commission's view) only by

highly deferential review in the appropriate court of appeals—violates NGA Section 24,

exceeds the Commission's authority, and improperly usurps this Court's exclusive jurisdiction

to adjudicate violations of the NGA.

126.   Examples from elsewhere in the United States Code show that Congress knows

how to write statutes that, "in express terms," place jurisdiction over penalties for violations

somewhere other than a district court.  *See Lees*, 150 U.S. at 478–79.  The Federal Deposit

Insurance Act, for example, allows "the appropriate Federal banking agency" to "assess" and

"impose[]" various "civil money penalties."  12 U.S.C. § 1818(i)(2).  Congress there referred to

these as "penalties" (not "proposed" penalties) *and* omitted any provision granting "exclusive" jurisdiction to federal district courts *and* further stated that, if the agency brings an action in a district court to collect on such a penalty, "the validity and appropriateness of the penalty *shall not be subject to review*." *Id.* § 1818(i)(2)(I) (emphasis added).

127. FERC has resisted this outcome in its own proceedings and in federal court. *See Total Gas & Power*, 2016 WL 3855865, at *11; *TOTAL Gas & Power*, 859 F.3d at 331–32. In doing so it has: (1) relied on a purported history of the Commission finding "violations" of the NGA; (2) argued that Section 22's inclusion of the word "assess" implies power to adjudicate violations; (3) pointed to caselaw describing a district court's jurisdiction as limited only to enforcement of FERC orders; (4) raised a statutory argument related to venue; (5) relied on caselaw interpreting Section 24's exclusivity language as depriving state courts of jurisdiction; and (6) argued inefficiency and statutory purpose. None of these six arguments withstands scrutiny.

128. First, some out-of-circuit cases, all pre-dating Congress's addition of a civil penalty provision to the NGA in 2005, refer to FERC's purported finding of NGA "violations" in the course of exercising its traditional regulatory authority in the rate-making and certification contexts. *E.g.*, *Transcon. Gas Pipe Line Corp. v. FERC*, 998 F.2d 1313 (5th Cir. 1993); *Walker Op. Corp. v. FERC*, 874 F.2d 1320 (10th Cir. 1989). But these cases do not speak to—much less purport to limit—the scope of Section 24. And FERC's own colloquial use of the word "violations" in these cases cannot somehow empower the Commission to overcome the "exclusive jurisdiction" that Section 24 confers on district courts.

129. Each of these cases arose instead from FERC's exercise of its expressly conferred *regulatory* authority. In *Transcontinental*, for example, FERC used its express authority under

NGA § 4 to approve natural gas rates after "a hearing concerning the lawfulness of" those "rate[s]," and "*to order such natural-gas company to refund*, with interest, the portion of" the "increased rates or charges *by its decision* found not justified."  15 U.S.C. § 717c(e) (emphases added).  FERC exercises NGA § 4 regulatory authority by issuing orders disapproving of rates and ordering refunds.  Although the FERC order reviewed in Transcontinental used language referring to a rejected rate as a "violation" of the NGA, 998 F.2d at 1317–20, NGA § 4 does not use that term.  Congress's language, not FERC's, controls on this question of statutory interpretation.

130.  *Walker Operating Corp.* involved another FERC regulatory function:  its approval or disapproval of a company's abandonment of a natural gas facility.  The company in that case had previously obtained a certificate of public convenience and necessity, thereby "dedicat[ing]" its natural gas to interstate commerce.  874 F.2d at 1328-29 (citing *United Gas Pipe Line Co. v. McCombs*, 442 U.S. 529, 536, 542 (1979); 15 U.S.C. §§ 717f(b)).  FERC and the courts informally described abandonment without agency approval as a "violation," even though FERC needed no jurisdiction over "violations" (nor was it granted any) when simply exercising its *regulatory* powers retroactively.

131.  Second, the fact that Section 22 of the NGA, 15 U.S.C. § 717t-1, authorizes FERC to "assess[]" a penalty does not equate to authority to adjudicate a violation.  *Cf. Total*, 176 FERC ¶ 61,026 at P 183 (arguing that the authority to "assess" a penalty implies such adjudicatory authority).  Section 22 follows a familiar pattern in the United States Code: pairing the word "assess" with "penalty," not with "violation," *id.* § 717t-1(b), and making eligibility for a penalty contingent on, and separate from, a finding of a "violation," 15 U.S.C. § 717t-1(a).  For example, when Congress wanted to give the Environmental Protection Agency

power both to find a violation of the Clean Water Act and to assess a penalty for such a violation, it explicitly did so, saying that whenever "the Administrator finds that any person has violated" certain statutory provisions, "the Administrator" was entitled to "assess a . . . civil penalty."  33 U.S.C. § 1319(g)(1); *see, e.g.*, *id.* § 1319(g)(8) (differentiating standards for judicial review of the "finding of a violation" from the "assessment of the penalty"); *see also, e.g.*, 16 U.S.C. § 620d(c)(2)(A) (granting Departments of Agriculture and Interior authority to "assess . . . a civil penalty" after first "find[ing], on the record and after an opportunity for a hearing, that a person has violated" a provision); 42 U.S.C. § 6303(d)(2)(A) (granting agency authority "assess a penalty, by order, after a determination of violation has been made on record after an opportunity for an agency hearing pursuant to section 554 of Title 5 before an administrative law judge"); 49 U.S.C. § 521(b)(1)(A), (b)(2) (granting Department of Transportation authority to "assess[]" a "civil penalty" upon "determin[ing]," "after notice and opportunity for a hearing," that a person "committed an act that is a violation of regulations").

132.   Thus, the word "assess" in Section 22 permits FERC to *propose* a penalty in the event a violation can be proved, but "exclusive jurisdiction" to determine whether the violation underlying that penalty assessment occurred lies in the district courts.

133.   Third, FERC places undue reliance on language in some district court cases describing the court's "role" as "one of mere enforcement" of a FERC order.  *See, e.g., Tenn. Gas Pipeline Co. v. Mass. Bay Transp. Auth.*, *Town of Dedham v. FERC*, 2 F. Supp. 2d 106, 109 (D. Mass. 1998).  That case and others like it merely hold that those actions brought under NGA § 24 to "enforce" an "order" issued pursuant to the NGA are not an occasion to review the underlying order itself.  This issue frequently arises when landowners seek to collaterally attack certificate orders that authorize construction or operation of pipelines or other energy-related

infrastructure.  *See id.*; *see also, e.g.*, *Rover Pipeline LLC v. Kanzigg*, 2017 WL 5448425, at *5 (S.D. Ohio Mar. 1, 2017); *Tennessee Gas Pipeline Co v. 104 Acres of Land More or Less, in Providence Cnty. of State of R.I.*, 749 F. Supp. 427, 430 (D.R.I. 1990).  These cases are inapt. FERC intends to adjudicate whether Plaintiffs violated an NGA regulation, and this lawsuit is not a collateral attack on that regulation's validity.  Instead, Plaintiffs invoke the district court's exclusive jurisdiction to adjudicate alleged "violations" of the regulation.

134.   Fourth, FERC's venue argument fails.  FERC's position is that because Congress did not enact a venue provision alongside the new civil-penalty remedy it enacted in the Energy Policy Act of 2005, Congress meant to strip district courts of their power to adjudicate civil penalties.  But Congress had no need to add a venue provision; Section 24 *already* specifies that venue for enforcement actions is the district where either "the violation occurred" or the "defendant is an inhabitant."  *See* 15 U.S.C. § 717u.  Certain other NGA provisions have "internal" venue clauses, but NGA provisions authorizing penalties for violations do not.  Most notably, the *criminal* penalty provision, *id.* § 717t, does not have its own venue clause because—as is true of *civil* penalties—Section 24 already specifies the venue for actions to adjudicate and impose liability for all NGA violations.

135.   Fifth, FERC contends that Section 24 merely addresses the division of power between federal and state courts, rather than excluding FERC from exercising jurisdiction over NGA violations.  That is wrong.  The plain meaning of the statutory text, historical common law, other provisions of the NGA, and the text of other New Deal-era statutes all confirm that "exclusive jurisdiction" means just that—jurisdiction granted solely to the district courts to adjudicate NGA violations.  None of these interpretive aids supports FERC's contrary view that

"exclusive" district court jurisdiction means one thing when it comes to state courts and another thing when it comes to a federal agency.

136.   The plain meaning of the statutory text is clear.   The word "exclusive" is unqualified:  It means that only federal district courts—not FERC, state courts, or any other tribunal—may adjudicate NGA violations or "enforce" any "liability" created under the NGA. If it were otherwise, federal court jurisdiction would hardly be "exclusive"; district courts would somehow share that jurisdiction with FERC and its ALJs, whom the NGA does not even mention.   Thus, FERC's argument that the district courts' jurisdiction is only "exclusive" with respect to some, but not others, is at odds with the plain meaning of "exclusive."

137.   The common law likewise supports this reading of Section 24.   In enacting Section 24, Congress codified in the NGA the default rule at common law:  "From the earliest history of the government, the jurisdiction over actions to recover penalties and forfeitures has been placed in the District Court."  *Lees v. United States*, 150 U.S. 476, 478–79 (1893).  Where "a statute imposes a penalty and forfeiture," jurisdiction therefore "vest[s] in the District Court, unless it is in express terms placed exclusively elsewhere."  *Id*. at 479.   The NGA contains no such "express terms," and nothing else in the statute suggests that the term "exclusive" may be twisted to permit FERC and its ALJs to share in the authority granted exclusively to the district courts.

138.   Other provisions of the NGA similarly demonstrate that when Congress used the term "exclusive," it did, in fact, define the relationship between the agency and courts, thus barring more than just, *e.g.*, state courts from adjudicating violations of the NGA.  Section 19(b) of the NGA gives the courts of appeals "jurisdiction," "[u]pon the filing of [a] petition," to review FERC's regulatory orders.  15 U.S.C.  § 717r(b).  "Until the" administrative record

"ha[s] been filed," the courts of appeals exercise their jurisdiction concurrently with FERC, *id*., leaving to the agency the power to "modify or set aside" its own order, *id*. § 717r(a). "[U]pon the filing of the record," however, the courts of appeals' jurisdiction becomes "exclusive," *id*. § 717r(b)—that is, FERC's concurrent jurisdiction with the courts ceases and those courts possess sole jurisdiction. Section 19(b)'s use of "exclusive" jurisdiction to govern the relationship between the courts and FERC—as opposed to just the relationship between federal and state courts—is significant because "'identical words'" in "'different parts of the same statute'" are "'presumed to have the same meaning.'"  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006).  Thus, Section 24 goes beyond merely allocating jurisdiction between state courts and federal courts, instead placing jurisdiction of NGA violations solely in federal district courts.

139.  Other New Deal-era statutes confirm this interpretation.  Section 27(a) of the Securities Exchange Act grants federal district courts "exclusive jurisdiction of violations" of the Securities Exchange Act in terms materially identically to Section 24 of the NGA and Section 317 of the FPA.  15 U.S.C. § 78aa(a).  Like the FPA—but *unlike* the NGA—the Exchange Act expressly provides a limited number of carve-outs from the district court's exclusive jurisdiction.  Section 21B of the Securities Exchange Act, for example, explicitly authorizes the SEC to "impose a civil penalty if *it finds*," at in-house proceedings, that the accused "has willfully *violated*" the statute.  *Id*. § 78u-2(a) (emphases added).  It thus reflects the "clear and manifest" expression of legislative intent necessary to partially repeal the exclusivity provision in Section 27(a).  *Watt*, 451 U.S. at 267 (quotation marks omitted).

140.  Other courts of appeals have confirmed this reading of the Exchange Act.  In *Wright v. SEC*, 112 F.2d 89 (2d Cir. 1940), the Second Circuit held that Section 27(a) did not

60

"deprive the [SEC] of the jurisdiction" to conduct proceedings that were "expressly authorized" by another, similar carve-out.  *Id*. at 95 (referring to former Section 19(a)(3) of the Exchange Act, which authorized the SEC to "suspend" a member of a "national securities exchange" "whom the Commission finds has violated" the statute, 15 U.S.C. § 78s(a)(3) (1940)).  *Wright* adds that Section 27(a) applies only to "proceedings initiated in the courts," and not to agency proceedings, a statement that is unsupported *dicta* because the Exchange Act—unlike the NGA—contained an express carve-out, and the court therefore had no occasion to consider whether the SEC could adjudicate penalties for violations where it lacked an express grant of authority.  When the Second Circuit did reach this issue directly years later, it affirmed that under Section 27(a) the SEC may not use otherwise conferred regulatory authority "as an additional weapon in its enforcement arsenal" that would thereby "usurp the jurisdiction of the federal courts to deal with 'violations' of the securities laws."  *Touche Ross & Co. v. SEC*, 609 F.2d 570, 579 (2d Cir. 1979); *see also Checkosky v. SEC*, 23 F.3d 452, 456 (D.C. Cir. 1994) (opinion of Silberman, J.) (*Touche Ross* "clearly distinguished the Commission's authority to discipline professionals from its substantive enforcement functions," since "under [Section 27(a)], district courts have exclusive jurisdiction over violations of the securities laws"), *superseded on other grounds by rule as stated in Marrie v. SEC*, 374 F.3d 1196, 1198 (D.C. Cir. 2004).  In contrast to the Exchange Act, the NGA lacks jurisdictional carve-outs for agency adjudication of violations; FERC, instead, must adjudicate alleged NGA violations in the district courts.

141.   FERC's argument here misreads decisions like *Pan American Petroleum Corp. v. Superior Court of Delaware*, which held that Section 24 and comparable provisions in other statutes bar state courts from intruding on the "exclusive jurisdiction" of federal courts.  366

U.S. 656, 662 (1961); *see also, e.g.*, *Tafflin v. Levitt*, 493 U.S. 455, 470–71 (1990).  Those courts decided the question before them:  whether an "exclusive jurisdiction" provision barred one of the parties from invoking state-court jurisdiction.  They did not rule that "exclusive jurisdiction" excludes *only* state-court jurisdiction.  Nor can such a conclusion be inferred from those rulings.  The opinion in *Pan American* shows why.  In ruling that state courts lack jurisdiction, the Court looked to both Section 24 and Section 19, "which," as just noted, "provide[ ] for review of Commission orders in the United States Courts of Appeals."  366 U.S. at 662.  The Court explained that "[i]n either case, the state courts are deprived of jurisdiction." *Id*.  The Supreme Court could not have been using that phrasing to silently rule that Sections 19 and 24 *only* deprive *state courts* of jurisdiction.  After all, Section 19 includes language addressing when jurisdiction transfers from *the Commission* to a federal court.  15 U.S.C. § 717r(b) ("Upon the filing of" a petition for review of a FERC order in a court of appeals, "such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part.")  Nothing in these other opinions, which address the power of state courts, alters the words "exclusive jurisdiction" to mean exclusive only in the context of state versus federal courts.  After all, in this Circuit at least, "[e]xclusive means exclusive."  *Am. Energy Corp. v. Rockies Exp. Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010).

142.  Sixth, "efficiency" concerns cannot override statutory text, and those concerns are misplaced in any event.  It would not be inefficient for a district court to adjudicate whether a company violated the NGA after FERC has conducted a proceeding and proposed a civil penalty.  The agency proceeding need not be extensive:  Section 22 does not require a "full" trial-like proceeding, and FERC has argued that Section 22 requires no more than "paper"

submissions, with the involvement of ALJs in some cases being a matter of grace.  Indeed, the process does not need to be any less efficient than the process that FERC uses in FPA matters.  As discussed in Section I.C, *supra*, FERC gives the accused in those matters an abbreviated opportunity to file arguments in what it calls an "adversarial proceeding," after which FERC goes to a district court to bring its enforcement action.

143.  Lastly, arguments about Congress's intent fail.  Congressional intent cannot alter clear statutory language, and, in any event, nothing suggests that Congress intended FERC to adjudicate alleged violations in an administrative proceeding.  Congress could have had a goal, in enacting the Energy Policy Act of 2005, to give FERC certain additional authority, but this does not mean that Congress also meant for FERC to have this particular adjudicative authority.  *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) ("it is quite mistaken to assume" "that 'whatever' might appear to 'further[ ] the statute's primary objective must be the law'" (citation omitted)).  Congress accomplished its goals by adding new substantive provisions, *e.g.*, 15 U.S.C. § 717c-1 (prohibiting market manipulation), and new remedies (substantial civil penalties).  That Congress did not give FERC even more authority may well have been "the price of passage;" "[l]egislation is, after all, the art of compromise." *Henson*, 137 S. Ct. at 1725.  Besides, the FPA and NGPA show that Congress did not believe an abrupt change in civil penalty *procedures* was needed, even if other changes were.  As noted above, Congress raised the FPA and NGPA penalties while still retaining district court adjudications of violations under those statutes.

## II.  The Procedures Both For Appointing and Removing FERC ALJs Violate Article II.

144.  Apart from the fact that the NGA does not authorize the Commission to assign fact-finding and adjudication of NGA violations to ALJs, setting this matter for hearing before an ALJ would violate Article II in two separate ways.  First, FERC ALJs are officers who, under

the Appointments Clause, must be appointed by the Commission acting as a whole, but FERC's chairman, acting alone, appoints them instead.  Second, the multiple levels of removal protection that FERC ALJs enjoy violates Article II's grant of executive power to the President.

145.    The Appointments Clause authorizes Congress to invest the appointment of "inferior Officers" in the President, in courts of law, or in "the Heads of Departments."

146.    It is undisputed that FERC ALJs are "inferior officers" and thus subject to the Appointments Clause.  *Total*, 176 FERC ¶ 61,026 at P 193 ("[T]he Commission finds that its ALJs are 'Officers of the United States,' subject to the Appointments Clause."); *id.* at PP 197–98; *see also Rover*, 178 FERC ¶ 61,028 at PP 60, 65 (same).

147.    FERC ALJs are appointed by the Chairman of FERC in his or her sole capacity. 42 U.S.C. § 7171(c); 18 C.F.R. § 376.105.  FERC insists that this qualifies as appointment by the "Head of [a] Department."  *Total*, 176 FERC ¶ 61,026 at P 198; *see also Rover*, 178 FERC ¶ 61,028 at PP 67–69.  But when a federal agency ("Department") has multiple members (*i.e.*, commissioners), its "Head" is the commission acting *collectively*, not the Chairman or any member acting alone.  *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 511–13 (2010) ("As a constitutional matter, . . . a multimember body may . . . be the 'Hea[d]' of a 'Departmen[t]' that it governs.").  As a result, setting this matter for administrative hearing before a FERC ALJ would violate the Constitution.

148.   FERC disagrees, contending that *Free Enterprise Fund* only held that a "Head of Department" could be a multi-member body acting collectively, not "that the department head of a multi-member body *must* be the multi-member body acting collectively."  *Total*, 176 FERC ¶ 61,026 at P 200; *Rover*, 178 FERC ¶ 61,028 at P 67.

149.    That interpretation does not withstand scrutiny.  In *Free Enterprise Fund*, the Supreme Court rejected the argument that the full Securities and Exchange Commission could not constitutionally appoint SEC ALJs.  *Free Enter. Fund*, 561 U.S. at 511–12.  FERC contends that the Court did not hold that an ALJ *must* be appointed by a full multi-member commission. But lower courts are bound by the Supreme Court's reasoning in deciding a case, not just the outcome.  *See Seminole Tribe of Fla v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").  Here, the Court's reasoning defeats FERC's position. The bases for the Court's holding were the following characteristics of the SEC:  (1) "[t]he Commission's powers are generally vested in the Commissioners jointly, not the Chairman alone"; (2) "[t]he Commissioners do not report to the Chairman, who exercises administrative and executive functions subject to the full Commission's policies"; (3) "[t]he Chairman is also appointed from among the Commissioners by the President alone, which means that he cannot be regarded as 'the head of an agency' for purposes of the Reorganization Act"; and (4) "[t]he Commission as a whole, on the other hand, does meet the requirements of the [Reorganization] Act."  *Free Enter. Fund*, 561 U.S. at 512 (citations omitted).  These characteristics led the Court to conclude that it was the SEC collectively—not the SEC Chairman—that could constitutionally appoint the SEC ALJs.  The Court did not reach the nonsensical result that the SEC has one "Head" for some purposes (the Chairman) and a different "Head" for others (the Chairman together with the other Commissioners).  Following the Court's reasoning in *Free Enterprise Fund*, the SEC Chairman is not a "Head of Department" and thus *cannot* appoint the SEC ALJs.

150.   FERC is like the SEC in all relevant respects.  Just like the SEC, FERC's powers are vested by the NGA in the Commissioners collectively, not in the Chairman alone.  *See, e.g.*, 15 U.S.C. § 717b(a) (authorizing "the Commission" to "promulgate regulations"); *id.* § 717c(a) (vesting jurisdiction over rates and charges with "the Commission"); *id.* § 717m(a) (authorizing "[t]he Commission" to investigate violations of the NGA).  As with the SEC, the other FERC Commissioners do not report to the Chairman, who is responsible only "for the executive and administrative operation of the Commission."   42 U.S.C. § 7171(c).   Just like the SEC Chairman, the FERC Chairman is designated from among "[o]ne of the [Commission] members . . . by the President" alone, *id.* § 7171(b)(1), meaning the FERC Chairman also "cannot be regarded as 'the head of an agency' for purposes of the Reorganization Act."  *Free Enter. Fund*, 561 U.S. at 512 (citing 5 U.S.C. § 904).[5]  And just like the SEC, it is FERC collectively that meets the requirements of the Reorganization Act because the Commission members are "appointed by the President, by and with the advice and consent of the Senate." 42 U.S.C. § 7171(b)(1).  Thus, *Free Enterprise Fund* compels the conclusion that the FERC's ALJs are not appointed in compliance with the Appointments Clause.

151.   FERC's ALJs operate in violation of Article II of the Constitution in a second way:  they enjoy multiple layers of protection from removal, which the Supreme Court has held to be unconstitutional for inferior officers.  FERC ALJs may be removed only for "good cause established and determined by the [MSPB]."  5 U.S.C. § 7521(a).  Members of the MSPB, in turn, may be removed only for "inefficiency, neglect of duty, or malfeasance in office."  *Id*. § 1202(d).  In addition, FERC Commissioners, who can remove ALJs only with the approval of

---

[5]  The Reorganization Act requires any "head of an agency" to be appointed "by the President, by and with the advice and consent of the Senate."  5 U.S.C. § 904.

the MSPB, themselves enjoy removal protections and "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 42 U.S.C. § 7171(b)(1). Thus, FERC ALJs have three layers of protection from removal, allowing them to exercise significant adjudicatory power without accountability to the President.

152. This violates Article II. The Supreme Court has held that Congressional authorization of more than one layer of tenure protection for "inferior officers" is "contrary to Article II's vesting of the executive power in the President" and thus "contravene[s] the Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 492, 496. In *Free Enterprise Fund*, the Court held unconstitutional statutory provisions imposing "dual for-cause limitations on the removal of" members of the Public Company Accounting Oversight Board (who were "inferior officers"), explaining that those provisions "not only protect[] Board members from removal except for good cause, but withdraw[] from the President any decision on whether that good cause exists." *Id.* at 495. The Court concluded that Article II forbids "two levels of protection from removal for those who nonetheless exercise significant executive power"—in other words, inferior officers like ALJs.

153. This reasoning applies equally to FERC's ALJs. As explained above, the APA requires "good cause" for the removal of FERC's ALJs. The APA then adds another layer of protection by preventing MSPB members themselves from being removed absent cause. Thus, just as was true for PCAOB members in *Free Enterprise Fund*, FERC ALJs cannot be removed except for good cause, *and* the APA "withdraws from the President any decision on whether that good cause exists." *Id.* at 495. As Justice Breyer explained in his concurrence in *Lucia v. SEC*, "Congress seems to have provided administrative law judges with two levels of protection from removal without cause—just what *Free Enterprise Fund* interpreted the Constitution to

67

forbid in the case of the Board members."  138 S. Ct. 2044, 2060 (2018).  Moreover, FERC

commissioners, who cannot remove ALJs without MSPB approval, are *themselves* protected

from removal without cause, further insulating ALJs from removal.  "The result is [ALJs] that

[are] not accountable to the President, and a President who is not responsible for the [ALJs]," in

violation of Article II.  *Free Enter. Fund*, 561 U.S. at 495.

### III.    Article III Of The Constitution And The Seventh Amendment Entitle Plaintiffs To A Jury Trial In Federal District Court.

154.    Apart from the illegal manner in which the Commission's ALJs are appointed,

Article III of the Constitution and the Seventh Amendment bar the Commission from

adjudicating its civil penalty claims against Plaintiffs in an administrative hearing rather than

litigating them in a district court action in which Plaintiffs would receive the benefit of the

protections of an Article III judge and their right to a jury trial.

155.    Article III provides that "[t]he judicial Power of the United States shall be vested

in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain

and establish," and that "[t]he Judges, both of the supreme and inferior Courts, shall hold their

Offices during good Behaviour, and shall, at stated Times, receive for their Services, a

Compensation, which shall not be diminished during their Continuance in Office."  U.S. Const.

art. III, § 1.  Under those provisions, adjudicative proceedings implicating "the judicial power of

the United States" must be conducted by a judge with life tenure and salary protection.  Article

III thus ensures that "the judicial power [is] entrusted only to those judges whose impartiality

and freedom from coercion are ensured by life tenure, subject only to impeachment, and by

irreducible compensation."  *Wimmer v. Cook*, 774 F.2d 68, 72 n.6 (4th Cir. 1985).  This Article

III guarantee "has a dual character: one part personal right of the litigant, one part structural

principle."  *Waldman v. Stone*, 698 F.3d 910, 917 (6th Cir. 2012).

156.  The Seventh Amendment preserves the right to a jury trial in civil trials by providing that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."  U.S. Const. amend. VII.  The Seventh Amendment guarantees the right to a jury trial in actions "brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41–42 (1989) (quoting *Curtis v. Loether*, 415 U.S. 189, 193 (1974)).

157.  Because "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law," "the Seventh Amendment require[s] a jury trial" in a civil action by the government to enforce a civil penalty for the violation of a federal statute.  *Tull v. United States*, 481 U.S. 412, 420, 422–23 (1987).  If the Commission brought a civil action to impose civil penalties on Plaintiffs for violating the NGA, Plaintiffs thus would be entitled to a jury trial before an Article III tribunal.  And because the Seventh Amendment would guarantee the right to a jury trial on this question in federal district court, Article III likewise requires that the issue be heard in an Article III court.  *Granfinanciera*, 492 U.S. at 53 ("[T]he question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal."); *Waldman*, 698 F.3d at 919 ("the analysis for" Seventh Amendment and Article III purposes "is the same").

158.  The Commission's reading of the NGA would deprive Plaintiffs of the right to a jury trial before an Article III judge and instead require them to defend against a civil penalty in an administrative adjudication before an ALJ who lacks life tenure and salary protection, and

who can be removed from office by the Commission.  5 U.S.C. § 7521.  The Commission thus seeks to infringe both Plaintiffs' "personal right" to have the allegations against them litigated in an Article III court and before a jury and the "structural principle" protecting the judicial branch from improper "diminution."  *Waldman*, 698 F.3d at 918.  The Constitution prohibits both results.

159.  While the Supreme Court has recognized a narrow class of cases in which Congress may "assig[n] the factfinding function and initial adjudication" to "an administrative agency in which no jury is available," *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 450 (1977), Congress has not done so here.  Nothing in the NGA or its legislative history demonstrates an affirmative choice by Congress to deprive defendants of the Seventh Amendment right to a jury and the protections of Article III in a civil penalty proceeding under the NGA.

160.  A statutory provision depriving Plaintiffs of the right to a jury trial in an Article III court would have been invalid, in any event, because a civil penalty proceeding under the NGA does not fall within the narrow class of cases that Congress can assign to agencies for administrative adjudication.  Under *Atlas Roofing*, Congress may assign the initial adjudication of civil penalties to an administrative agency when "the Government sues in its sovereign capacity to enforce *public rights* created by statutes within the power of Congress to enact," 430 U.S. at 450 (emphasis added), such as federal health and safety standards, *id.* at 445, 450, import tariffs, *Ex parte Bakelite Corp.*, 279 U. S. 438, 458 (1929), and the right to protect public resources by auditing the accounts of federal employees, *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272 (1855).  "Unless a legal cause of action involves 'public rights,'" however, "Congress may not deprive parties" of their "personal right" to a jury

70

trial or an Article III forum in which to exercise that right. *Granfinanciera*, 492 U.S. at 53; *Waldman*, 698 F.3d at 917. Similarly, Congress may not "shift the judicial Power" to adjudicators that lack tenure and salary protections without making the judicial branch "weaker and less independent than it is supposed to be," thus violating Article III's "structural principle" in addition to litigants' personal rights. *Waldman*, 698 F.3d at 918.

161. The "public rights" exception to this regime does not apply. To determine if a public or private right is at stake, a court must weigh (1) "'the extent to which the essential attributes of judicial power are reserved to Article III courts'"; (2) "'the origins and importance of the right to be adjudicated'"; and (3) "'the concerns that drove Congress to depart from the requirements of Article III.'" *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–79 (2015) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986)). These factors demonstrate the private nature of the rights that FERC seeks to enforce in an administrative proceeding: FERC ALJs exercise substantial "judicial power" by determining the amounts of NGA civil penalties, subject only to review for "substantial evidence." *See, e.g.*, *Statement of Admin. Policy Regarding the Process for Assessing Civil Penalties*, 117 FERC ¶ 61,317 at 7 (2006); 15 U.S.C. § 717r(b). Allowing FERC ALJs to also determine violations in the first place would give them even more substantial "judicial power." And Congress never articulated any concern warranting removal of NGA violations from the traditional jurisdiction of Article III courts subject to the right to a jury trial. Indeed, Congress expressly approved of district court adjudication of materially identical violations under the FPA. 18 C.F.R. § 1c.1; 16 U.S.C. §§ 823b(d)(3), 824v. Yet Congress did not say, much less explain why, a different administrative procedure was needed for such claims under the NGA; as FERC concedes, "the legislative history of the [Energy Policy Act of 2005] does not discuss the grant of NGA civil

penalty in any detail." *ETP*, 121 FERC ¶ 61,282 at 55.  "[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Art[icle] III courts." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 n.23 (1982).  Without any evidence that Congress intended to remove NGA violations from the traditional jurisdiction of Article III courts, subject to the right to a jury trial, the presumption in favor of judicial adjudication prevails.

162.    Plaintiffs are entitled to a jury trial before an Article III court.  By instead setting the matter for an administrative hearing, in which no jury is available and over which an ALJ, rather than an Article III judge, will preside, FERC's procedures violate Article III and deprive Plaintiffs of their Seventh Amendment right to a jury trial.

## IV.    Administrative Adjudication Would Deprive Plaintiffs Of Their Fifth Amendment Right To A Fair Trial Before An Impartial Tribunal.

163.    Putting aside that FERC's practice of assigning NGA civil penalty matters for administrative hearings before ALJs appointed by the FERC Chairman violates the NGA, Article II, Article III, and the Seventh Amendment, the Fifth Amendment's Due Process Clause precludes FERC from subjecting Plaintiffs to an administrative adjudication because FERC's practices and procedures already have denied, and will continue to deny, Plaintiffs "impartial adjudicators," and will subject them to a tribunal lacking the appearance or reality of justice.

164.    It is well established that a "fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955).  Due process protects against not only unfairness, but also "the probability of unfairness," and such proceedings "'must [also] satisfy the appearance of justice.'" *Id.* at 134–35.  Due process requires an "impartial" adjudicator, thus barring a prosecutor from serving as judge in the same case.  *Id.*  That requirement also is not

satisfied, and due process is lacking, when an adjudicator's "mind is 'irrevocably closed'" before the hearing has even begun. *NEC Corp. v. United States*, 151 F.3d 1361, 1373 (Fed. Cir. 1998).

165.    The Commission violates this requirement by failing to provide either the appearance or the reality of a fair tribunal.   Under the Commission's procedures, the very Advisory Staff who communicate *ex parte* with Enforcement Staff during the investigation phase are permitted to advise the Commissioners and FERC's ALJs during the adjudicatory phase. Parkinson Written Testimony at 10–11.   Because FERC does not keep records of *ex parte* communications between Enforcement Staff and Advisory Staff, Respondents have no assurance against Advisory Staff being biased by these *ex parte* communications with Enforcement Staff— nor is there a safeguard against Advisory Staff providing biased advice to FERC's decision-makers in subsequent *ex parte* communications with those adjudicators.

166.    FERC's decisional process thus cannot satisfy even the appearance of impartiality.   For years, FERC's proceeding against Plaintiffs has been tainted by these "candid back-and-forth discussions and oral briefings," *id.*, with no opportunity for Plaintiffs to challenge the errors in Enforcement Staff's findings.   The result of this bias is undeniable.   As explained earlier, during the entire 15-year period since Congress enacted civil penalties for NGA violations, FERC has *always* issued an Order to Show Cause, found that a violation has occurred, and proposed penalties in contested proceedings after Enforcement Staff has issued a 1b.19 Notice.   Indeed, the *only* time FERC has ever terminated proceedings after Enforcement Staff has issued a 1b.19 Notice is when Enforcement Staff reversed its position after an Order to Show Cause was issued—based on an undeniable calculation error that the respondent pointed out— and "*recommend[ed]* that the Commission vacate the Order to Show Cause and assess no penalty." *Footprint Power LLC*, 166 FERC ¶ 61,150 at P 7 (2019) (emphasis added).   This is in

stark contrast to the record at the SEC, where at least twenty percent of the Wells notices (the functional equivalent of a FERC 1b.19 Notice) result in that agency voluntarily terminating its investigations. *See* Eaglesham, *supra*. Moreover, Enforcement Staff have stated publicly that "attorneys who serve as investigative staff have an attorney-client relationship with the Commission." Parkinson Written Testimony at 1. Thus, communications between the Enforcement Staff and the Commissioners (and their staff) create the kind of relationship that never would or could exist in an impartial process.

167. Instead of heeding Congress's express grant to federal district courts of "exclusive jurisdiction" to adjudicate alleged NGA violations, FERC contends it can adjudicate Plaintiffs' action through a process severely slanted in favor of Enforcement Staff. As with all prior cases since 2005, the Commission determined that Enforcement Staff made out a *prime facie* case of an NGA violation only *after* having the benefit of off-the-record, *ex parte* communications with Enforcement Staff that Plaintiffs have no ability to challenge. Moreover, in issuing an Order to Show Cause, FERC shifted to Plaintiffs the burden of proving that no violation occurred. *Rover*, 174 FERC ¶ 61,208 at P 1. FERC then intends to have its ALJ conduct a hearing, which can occur, if FERC chooses, on an accelerated timeline that can leave little time for Plaintiffs to prepare a defense. At such hearings, FERC ALJs do not apply the Federal Rules of Civil Procedure and Evidence. 18 C.F.R. § 385.101. FERC ALJs have free reign to admit hearsay—including that derived from the Enforcement Staff's *ex parte* depositions of witnesses—which Plaintiffs may lack any meaningful opportunity to rebut. *Id.* § 385.509(a). Despite this low standard for admissibility of prosecution evidence in FERC hearings, ALJs will also exclude relevant exculpatory evidence; for example, by permitting FERC's Enforcement Staff to claim privilege without producing a privilege log. *E.g.*, Order Confirming Ruling at P 7, *BP Am. Inc.,*

*et al.*, Docket No. IN13-15-000 (July 3, 2014) (permitting Enforcement Staff to avoid producing privilege log of documents withheld during discovery in recent market manipulation case—despite a contrary requirement in FERC's own regulations, 18 C.F.R. § 385.410(d)(2)(i)—because it would have been "unduly burdensome and it would take staff resources away from preparing for the hearing").  Indeed, Plaintiffs may never even know about all of the exculpatory evidence necessary to defend themselves:  Although FERC concedes that its policies require Enforcement Staff to disclose all evidence that a prosecutor would be required to disclose under *Brady v. Maryland*, 373 U.S. 83 (1963) (*see* Parkinson Written Testimony at 6)—i.e., all exculpatory evidence—between 2005 and June 2014, the Office of Enforcement had provided exculpatory material in only four cases (two public and two nonpublic) under any of FERC's three organic statutes.  *See* Responses of Norman C. Bay to Supplemental Questions for the Record, Confirmation Hearing Before the S. Comm. on Energy & Nat. Res., 113th Cong. (2014), http://www.energy.senate.gov/public/index.cfm/files/serve?File_id=0f7ff1da-a68b-4cf7-bf36-52b524020dd1; Letter from Norman C. Bay to Sen. Mary L. Landrieu (June 17, 2014) (clarifying previous responses), http://www.energy.senate.gov/public/index.cfm/files/serve?File_id=6a4d929c-f5f4-4d6f-be99-d5cc98e996b0.  FERC ALJs thus adjudicate whether a violation of the NGA has occurred on a record that heavily favors the Enforcement Staff and, in important respects, is hidden from Plaintiffs.

168.    Any findings that a FERC ALJ makes in this *ultra vires* hearing will then be reviewed by FERC Commissioners, even though it is FERC Commissioners who decide in the first place that Enforcement Staff made out a *prime facie* case that Plaintiffs violated the NGA, and even though they made that decision based on extensive, undisclosed *ex parte* discussions with Enforcement Staff.  It should come as little surprise that such procedures have *never*

resulted in a finding by the Commission that no violation of the NGA (or the other main statutes FERC administers) has occurred and no civil penalty is warranted.  In fact, only once since 2005 has even a single FERC Commissioner issued a dissenting opinion on the merits of a proposed civil penalty in an assessment order.  And under FERC's view, all this fact-finding will be subject only to highly deferential "substantial evidence" review in a court of appeal—thus potentially allowing FERC to compel Plaintiffs to pay tens of millions of dollars even if the preponderance of the evidence shows that no violation occurred.  *See, e.g.*, *Columbia Gas Transmission Corp. v. FERC*, 448 F.3d 382, 385 (D.C. Cir. 2006) (substantial evidence standard requires "'less than a preponderance of the evidence'").  There is no doubt that this impermissible process has denied, and will continue to deny, Plaintiffs an "impartial" adjudication in a tribunal with both "the appearance" and the reality "of justice," and thus an agency adjudication would violate due process.

169.  "[D]isinterested factfinding and evenhanded adjudication" are particularly "essential" here because of the "serious" nature of "[t]he fines assessed."  *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 837–38 (1994); *cf. Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) ("[T]he specific dictates of due process" depend upon the nature of "the private interest that will be affected.").  As noted above, the NGA imposes substantial monetary penalties—up to $1,000,000 per day per violation.  15 U.S.C. § 717t-1(a).  Those penalties quickly exceed any benefit that could be realized from engaging in the purportedly illegal conduct.  Indeed, FERC's penalties typically are grossly disproportionate to the amounts FERC alleges that violators gained from the alleged violations.  For example, in FERC's last ten enforcement actions assessing both penalties and disgorgement for alleged gain, FERC's proposed penalties ranged from 475% to more than 5,200% of the alleged gain.  *See* FERC Civil

Penalty Actions, http://www.ferc.gov/enforcement/civil-penalties/civil-penalty-action.asp. In those ten enforcement actions, the average proposed penalty was more than 1,650 per cent greater than the alleged gain. *Id.* In one recent enforcement case alleging a violation of the NGA, FERC sought to assess a penalty that is thirty-five times the size of the alleged gain ($28 million dollar penalty versus just $0.8 million in alleged gain). *See BP*, 144 FERC ¶ 61,100 at P 1 ("The Commission directs BP to show cause why it should not be assessed a civil penalty in the amount of $28 million and disgorge $800,000 plus interest . . . ."). Indeed, in its proceeding against Plaintiffs, FERC is seeking a penalty—over $20 million—for the lawful demolition of the Stoneman House that is staggeringly 486 times the appraised tax roll value of that House ($41,090). The disproportionality of these proposed penalties to the alleged gain confirms the need for a neutral adjudicator.

170. The Commission unlawfully claims authority to set this matter for administrative adjudication before an ALJ with the Commission having the final say on all factual determinations relating to the allegations against Plaintiffs, subject only to what the Commission describes as highly deferential review in a court of appeals. Because its track record shows that the Commission is not an impartial adjudicator, that procedure would deprive Plaintiffs of due process in violation of the Fifth Amendment.

## V. FERC's *Ex Parte* Communication Policy Violates The APA.

171. As a result of FERC's lopsided policies, the administrative hearing contemplated by FERC would also violate the provision of the APA that prohibits *ex parte* communication between investigative and adjudicatory staff. FERC claims to "wal[l] off [its] investigatory staff" from the Commission during "the adjudicative stage"—that is, once "the Commission issues an Order to Show Cause." Parkinson Written Testimony at 1. But this occurs very late in the process—often after years of *ex parte* communication between Enforcement Staff and the

Advisory Staff who advise the Commission during adjudication.  Enforcement Staff acknowledge, as they must, that "the Commissioners and their staff . . . communicate freely with investigative staff on a wide range of topics" during the investigative stage.  Parkinson Written Testimony at 10.  As a result of these communications, the Commission's administrative hearing procedures cannot provide Plaintiffs with a meaningful opportunity to contest the charges against them in an impartial forum.  Instead, the Commission consistently rubber stamps the recommendations of Enforcement Staff and affirms Enforcement Staff's allegations without meaningful review of the merits of those recommendations.

172.    In addition to violating the Fifth Amendment right to due process, this practice violates Section 5(d) of the APA, which requires a separation of functions between an agency's investigative and adjudicatory personnel in formal agency adjudication.  Section 5(d) provides, among other things, that "[a]n employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings."  5 U.S.C. § 554(d).  The purpose of this provision is "to curtail and change the practice of embodying in one person or agency the duties of prosecutor and judge."  *Wong Yang Sung v. McGrath*, 339 U.S. 33, 41 (1950).  That practice "threaten[s] to bias administrative adjudications."  *Prof'l Air Traffic Controllers Org. v. Fed. Labor Relations Auth.*, 685 F.2d 547, 567 (D.C. Cir. 1982).

173.    The Commission has stated that its ALJ proceedings purporting to adjudicate whether a violation of the NGA occurred, if otherwise permitted by law and the Constitution, are subject to APA Section 5(d).  *See ETP*, 121 FERC ¶ 61,282 at P 78 ("Therefore, NGA section 22 civil penalty provisions fall within APA section 554(d).  APA section 554(d)(2) requires

agencies to separate the functions of 'investigating or prosecuting' from the function of adjudicating.").

174.    While the APA and due process appear to permit the "members of the body comprising the agency"—that is, FERC's individual Commissioners—to participate in certain capacities and to engage in certain *ex parte* communications during both the investigative and adjudicatory stage, 5 U.S.C. § 554(d); *see also Air Prods. & Chems., Inc. v. FERC*, 650 F.2d 687, 709–10 (5th Cir. 1981), the APA does not exempt the Commission's Advisory Staff from the prohibition in Section 5(d).  *See*, *e.g.*, *Grolier, Inc. v. FTC*, 615 F.2d 1215, 1220 (9th Cir. 1980) (applying Section 5(d)'s separation of function provisions to FTC Commissioner's attorney-advisor); *see Gibson v. FTC*, 682 F.2d 554, 563 (5th Cir. 1982) ("agree[ing] [with *Grolier*], without deciding, that [APA Section 5(d), 5 U.S.C.] § 554(d)[,] applies to . . . an attorney-advisor").

175.    FERC's Advisory Staff members are involved in investigative functions by "communicat[ing] freely with investigative staff on a wide range of topics" during investigations, including the discussion of "the types of conduct staff is investigating, the progress of those investigations, the merits of potentially settling those investigations, and many other important judgment calls that arise in complex enforcement cases."  Parkinson Written Testimony at 10.  These "candid back-and-forth discussions and oral briefings" are about "the merits of the investigation," and are made for the purposes of "directing [and] supervising" the work of the investigative staff, among other purposes.  *Id*. at 10–11 (quotation marks omitted).  Indeed, "[v]irtually every complex FERC investigation involves collaboration with a multi-disciplinary team" of "experts," including "engineers, analysts, economists, lawyers, and other knowledgeable professionals outside the investigative team" who are members of the

Commission's Advisory Staff.  *Id.* at 11.  "Enforcement staff relies on [these] experts" to "help analyze data and legal theories and reach thoughtful, informed conclusions about what conduct constitutes a violation, and whether such conduct is (or is not) harmful to FERC-regulated markets."  *Id.*

176.    Because FERC's Advisory Staff are involved in investigating enforcement actions, the APA prohibits those staff members from "participat[ing] or advis[ing] in the decision, recommended decision, or agency review" of those enforcement actions, 5 U.S.C. § 554(d), including the Commission's review of ALJ findings in an administrative hearing or its decision to assess a penalty based on that review.

177.    Despite this APA prohibition, FERC allows the Commission's Advisory Staff members who engaged in *ex parte* communications with the Enforcement Staff during the investigation to advise the Commissioners at the decisional stage in their review of ALJ findings and their imposition of a penalty.   FERC merely prohibits most—but not even all of—the relevant *Enforcement Staff* (*i.e.*, staff members in the Office of Enforcement that conducted the investigation and are preparing for trial) from "participat[ing] or advis[ing] as to the findings, conclusion or decision."  18 C.F.R. § 385.2202.  Any FERC staff member *not* "assigned to work up the proceeding or to assist at trial" may advise the Commission, even if that individual had previously worked on the investigation or had *ex parte* discussions with those responsible for investigating and later prosecuting alleged violations.  *Id.*  FERC's orders barring staff members from participating in the Commission's adjudicatory decisions thus are limited to Enforcement Staff—Advisory Staff members are not restricted.   *See*, *e.g.*, *BP*, Notice of Designation of Commission Staff as Non-Decisional, Docket No. IN13-15-000 (Aug. 5, 2013); *ETP*, Notice of Designation of Commission Staff as Non-Decisional, Docket No. IN06-3-000 (Dec. 20, 2007);

*Amaranth*, Order Designating Commission Staff as Non-Decisional and Ordering Brief, Docket No. IN07-26-000 (Feb. 1, 2008). Moreover, even FERC's bar on Enforcement Staff participation is not universal, as these same orders expressly exempt specific Enforcement Staff members—including the Director of the Office of Enforcement and the Director of the Office of Investigations—who certainly communicated with or advised those conducting FERC's investigations. *See id.* This unduly narrow view of *ex parte* communications violates APA Section 5(d) and thus "threatens to bias [FERC's] adjudicatio[n]" of the claims against Plaintiffs. *Prof'l Air Traffic Controllers*, 685 F.2d at 567.

## VI. Plaintiffs' Conduct Culminating In The Removal Of The Stoneman House Did Not Violate The NGA or Section 157.5 of FERC's Regulations.

178. Plaintiffs complied with all of their obligations under the Natural Gas Act, including their obligation to provide all "pertinent" data and information "necessary" for FERC to understand the Project and its effects. FERC's allegations that the Plaintiffs violated the NGA or FERC's regulations are meritless for at least the following four reasons.

179. *First*, Rover committed, through a screening plan, to mitigate the only effects that the Project posed to properties outside the right-of-way of the pipeline, like the Stoneman House: the visual and audial impacts of the CS1 compressor station. Providing a solution to those limited, Project-specific effects was Rover's sole commitment, because the property (and the Stoneman House) was never within the Project's right-of-way. Plaintiffs, therefore, reasonably believed that those visual and audial impacts were the only possible impacts of the CS1 station on the Stoneman House that required mitigation, as supported by contemporaneous discussions with Ohio's SHPO and FERC. Moreover, the manner of mitigation of those visual and audial impacts (screening) was well-established and uncontroversial. Rover fully honored its mitigation commitment.

180.    *Second*, the evidence—including FERC's own evidence—overwhelmingly demonstrates that from the time Plaintiffs identified the ten-acre property with the Stoneman House, they intended to use it as office and storage space for all of its nearby projects of which the Project was only one, and they intended to use the Stoneman House in furtherance of that goal unless that building proved unsuitable.  This was in accordance with Plaintiffs' and industry standard practice.  Indeed, it is beyond dispute that Plaintiffs sought a regional operations center near the CS1 compressor station long before they identified the Stoneman House and the property on which it sat.  Having identified the property with the Stoneman House, Plaintiffs recognized that the location was perfect for a base of operations due to its proximity to CS1 and other projects.  When they purchased the ten-acre property, Plaintiffs took steps to protect the Stoneman House from harm until it could be evaluated for use as office space.  Plaintiffs only decided to remove the Stoneman House—a full year after closing on the purchase—after three on-site inspections and evaluations, all of which determined that the age and decrepit state of the house put it beyond any reasonable restoration efforts.  Based on these inspections, Plaintiffs concluded that the Stoneman House's condition rendered it unsuitable as an office.  Plaintiffs then confirmed that no laws or regulations prevented the Stoneman House's removal, informed Ohio's SHPO of their intent to remove the Stoneman House with ample time for objection (the SHPO did not object), and asked a FERC Staff member whether removing the Stoneman House raised any issues, who confirmed that it did not.  The law required nothing more.

181.    *Third*, FERC's allegations concerning Plaintiffs' purported motive to demolish the Stoneman House in secret make no sense.  FERC alleges that Plaintiffs concealed their purchase and removal of the Stoneman House from FERC in order to avoid certain mitigation options, such as relocating either the CS1 compressor station or the Stoneman House itself.  In

reality, the ownership and status of the Stoneman House could have no effect on any mitigation options at all, and Plaintiffs therefore had no reason to purportedly hide their activities with respect to the Stoneman House.  There was never any possibility that the CS1 compressor station could be placed in a different location, as FERC acknowledged, and thus purchasing and removing the Stoneman House could not have helped Plaintiffs avoid a non-existent mitigating option of relocating it.  Similarly, FERC never suggested that the Stoneman House should be moved or explained how the identity of the property owner could have any bearing on the viability of that as a mitigation option (because it could not).  Rather, because the Stoneman House was never in the Project's right-of-way, the only possible impacts on it from the CS1 compressor station were visual and audial.  Plaintiffs already had in place a mitigation plan to counter those visual effects, and for the location chosen, the screening plan was a tried-and-true mitigation method.  In fact, screening would have to be—and was—implemented to mitigate those effects on *all* neighboring properties, not just the Stoneman House, and fully satisfied the Plaintiffs' mitigation requirement.  Moreover, even if other mitigation options were required or available (and they were not), FERC's theory would still make no sense—Plaintiffs would hardly have hidden from FERC their activities concerning the Stoneman House if those activities would have allowed them to avoid these supposed additional mitigation options.

182.  *Fourth*, Plaintiffs were at all relevant times forthright with the Commission and did not try to conceal their plans for the Stoneman House and property.  Rather, Plaintiffs informed the Ohio SHPO—the very agency responsible for recommending mitigation for effects on the Stoneman House (and other neighboring properties)—about the proposed removal of the Stoneman House well in advance.  Plaintiffs then waited another two months after the SHPO was informed before acting on the decision to remove the Stoneman House.  During this time, the

Ohio SHPO never objected to the removal of the Stoneman House, never asked for additional information, never sought to postpone the removal, and never took any other action that could have reasonably indicated to Plaintiffs that the SHPO was concerned about the removal. Further, Plaintiffs' outside counsel reached out to a contact at FERC prior to the removal of the Stoneman House, who confirmed that if the Stoneman House was not listed on the NRHP and was not on the pipeline's right-of-way, then it was "a non-issue." Plaintiffs had no reason to suspect, therefore, that either FERC or the SHPO had any issues with Plaintiffs' removal of the Stoneman House. As explained above, Plaintiffs did not "purchase and conceal" anything from FERC because its mitigation efforts were always focused on how the sight or sound of the CS1 compressor station would affect all neighboring properties, and purchasing the Stoneman House had nothing to do with those mitigation options.

183. At bottom, information about Plaintiffs' purchase and removal of the Stoneman House was outside the scope of the requirements of Section 157.5 of FERC's regulations because the ownership or status of the Stoneman House could not have affected the mitigation of the visual or audial effects of CS1—which were the Project's only possible impacts on the Stoneman House and the surrounding area, of which FERC's staff were already aware, and which Plaintiffs already promised to mitigate for *all* properties near the CS1 station, including the Stoneman House. The evidence is clear that Plaintiffs acquired the Stoneman House and the surrounding property for the legitimate purpose of creating a regional operations center, Plaintiffs did not remove the Stoneman House until satisfying themselves that removal was both necessary and lawful, and Plaintiffs had no obligation to inform FERC about the removal of the Stoneman House. Plaintiffs are therefore entitled to a declaratory judgment that recognizes that they did not violate the NGA or Section 157.5 of FERC's regulations by omitting information

about the Stoneman House because that information was neither "necessary" not "pertinent" to a full and complete understanding of the Project.

## CLAIM FOR DECLARATORY RELIEF

### Count I:  Declaratory Judgment As To Exclusive Jurisdiction Of Federal District Courts Over Violations Of The NGA Pursuant To 28 U.S.C. § 2201

### A.    NGA Section 24

184.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 183.

185.    By granting federal district courts, including this Court, "exclusive jurisdiction" over violations of the NGA and rules and regulations thereunder, Section 24 of the NGA bans FERC from adjudicating such violations at an administrative hearing.  Instead, alleged NGA violations must be adjudicated *ab initio* in federal district court.

186.    The doctrine of "constitutional avoidance" also warrants construing Section 24 of the NGA to require district court adjudication of the Commission's allegations of NGA violations because there are at least serious questions about the constitutionality of allowing FERC to adjudicate alleged violations through the ALJ process.  Construing the NGA to require district court adjudication of violations would avoid those serious constitutional questions.

187.    Plaintiffs therefore are entitled to a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 declaring that NGA Section 24 requires that any proceeding by FERC alleging that Plaintiffs violated the NGA or any rule, regulation, or order thereunder must be adjudicated in a federal district court, not before the agency.

### B.    Article II

188.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 183.

189.    Because FERC's procedure for appointing its ALJs and multiple layers of protection for FERC's ALJs against removal violate Article II, including its Appointments

Clause, setting this matter for administrative hearing before a FERC ALJ would be unconstitutional.

190.    Plaintiffs therefore are entitled to a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 declaring that under Article II, any proceeding by FERC alleging that Plaintiffs violated the NGA or any rule, regulation, or order thereunder must be adjudicated in federal district court.

### C.    Article III And Seventh Amendment

191.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 183.

192.    Article III requires FERC to pursue NGA enforcement actions in federal district court.  The Seventh Amendment gives Plaintiffs the right to a jury trial.  By instead setting the matter for an administrative hearing before an ALJ, subject to *de novo* Commission review with only deferential review by a court of appeals, FERC's procedures violate Article III and deprive Plaintiffs of their Seventh Amendment right to a civil jury.

193.    Plaintiffs therefore are entitled to a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 declaring that under Article III and the Seventh Amendment, any attempt by FERC to establish that Plaintiffs violated the NGA or any rule, regulation, or order thereunder must be adjudicated in federal district court, where Plaintiffs are free to exercise their right to a jury trial.

### D.    Fifth Amendment Due Process Right To An Impartial Tribunal

194.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 183.

195.    Because the Commission's track record since 2005 shows an apparent bias against entities similarly situated with Plaintiffs and in favor of Enforcement Staff, and in light of the massive penalties that the Commission claims the power to impose, allowing the Commission to set this matter for an administrative hearing before an ALJ would deprive

Plaintiffs of a fair trial before an impartial adjudicator in violation of Plaintiffs' Fifth Amendment right to due process.

196.     Plaintiffs therefore are entitled to a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 declaring that under the Fifth Amendment, any proceeding by FERC alleging that Plaintiffs violated the NGA or any rule, regulation, or order thereunder must be adjudicated in federal district court.

### E.     APA Section 5(d)

197.     Plaintiffs re-allege the allegations contained in paragraphs 1 through 183.

198.     FERC's policy of permitting Commission Advisory Staff members who engaged in *ex parte* communications with the Enforcement Staff at the investigation stage to participate in or advise the Commission's review of an ALJ finding that a violation has occurred or that a penalty should be assessed violates APA Section 5(d).

199.     Plaintiffs therefore are entitled to a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 declaring that under Section 5(d), any proceeding by FERC alleging that Plaintiffs violated the NGA or any rule, regulation, or order thereunder must be adjudicated in federal district court where the right to a jury trial is preserved, or, in the alternative, that under Section 5(d), the Commission must prohibit Commission staff members who engaged in *ex parte* communications with the Enforcement Staff at the investigation stage from participating in or advising the Commission's review of ALJ findings or its assessment of a penalty.

### Count II: Declaratory Judgment Determining Plaintiffs Are Entitled To A Judicial Determination That They Did Not Violate Section 7 Of The NGA Or Section 157.5 of FERC's Regulations

200.     Plaintiffs re-allege the allegations contained in paragraphs 1 through 183.

201.     Section 157.5 of FERC's regulations provides that applicants under Section 7 of the NGA "shall set forth all information necessary to advise the Commission fully concerning the operation, sales, service, construction, extension, or acquisition for which a certificate is requested" unless the applicant makes "a definite and positive showing that the information or data called for by the applicable rules is not necessary for the consideration and ultimate determination of the application." 18 C.F.R. § 157.5(a)–(b).  The burden of making this showing rests with the applicant. *Id.* § 157.5(c).

202.     Plaintiffs complied with all requirements of Section 157.5 because they disclosed all information necessary and pertinent to a full understanding of the Project.

203.     In particular, prior to filing their application to construct and operate the Project, including CS1, under Sections 3 and 7 of the NGA, Plaintiffs diligently investigated and identified potential effects of the Project on various resources, including the Stoneman House. Plaintiffs identified the only potential effects from the Project on the Stoneman House and the surrounding properties to be indirect visual and audial impacts of the CS1 compressor station. Plaintiffs reported all necessary and pertinent information concerning these potential effects to FERC, including its plan and commitment to mitigate those specific visual and audial effects, on several occasions, including at a pre-filing meeting with FERC staff on February 5, 2015 in Rover's February 20, 2015 Application for a Certificate of Public Convenience and Necessity filed pursuant to the NGA, and in Rover's March 25, 2016 response to FERC's Draft Environmental Impact Statement.  Because Plaintiffs disclosed all information relevant to the their promise to mitigate the visual and audial effects of the CS1 compressor station, which were the only effects of CS1 on the surrounding properties (including the Stoneman House), Plaintiffs fully complied with Section 157.5.

204.    During this time period, Plaintiffs also identified and purchased the Stoneman House and the 10-acre property on which it sat for use as a regional operations center.  After three inspections, however, it became apparent that the Stoneman House was too dilapidated to be suitable for that use and Plaintiffs subsequently decided to remove it.

205.    Plaintiffs understood that the purchase of the Stoneman House and its removal was not necessary or pertinent to FERC's full understanding of the Project in accordance with Section 157.5, because that removal had no effect on any of Plaintiffs' mitigation obligations related to the Project and the Stoneman House and property were not in the Project's right-of-way.  That understanding was confirmed by an employee of FERC, who stated that removal of the Stoneman House was a "non-issue."  Plaintiffs therefore were not required to inform FERC about their purchase and removal of the Stoneman House.  Plaintiffs, however, did inform Ohio's SHPO about the proposed removal months in advance because FERC's regulations designated the SHPO as the point of contact for resources like the Stoneman House.  The SHPO did not object to the removal of the Stoneman House or respond at all.  At all times during the relevant period, Plaintiffs were forthright and provided all information and data to FERC that was necessary and pertinent to the Project.

206.    Accordingly, because Plaintiffs have made a definite and positive showing that information concerning their purchase and subsequent removal of the Stoneman House is not necessary or pertinent for FERC's consideration and ultimate determination of Plaintiffs' application under the NGA to construct and operate the Project, and FERC cannot establish otherwise, Plaintiffs are entitled to a Declaratory Judgement that Plaintiffs did not violate the NGA or Section 157.5 of FERC's regulations pursuant to 28 U.S.C. §§ 2201 and 2202 as a result

of Plaintiffs' purchase and removal of the Stoneman House and associated conduct alleged in FERC's Order to Show Cause and Order Establishing Hearing.

## JURY DEMAND

207.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable as such.

## PRAYER

208.    Plaintiffs therefore respectfully pray for a judgment:

a.      Granting the forms of declaratory relief set forth above;

b.      Awarding costs, including attorney's fees; and

c.      Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: January 28, 2022                     /s/ Gregory J. DeGulis

                                            Gregory J. DeGulis (0045705)
                                               *Attorney of Record*
                                            MCMAHON DEGULIS LLP
                                            812 Huron Road, Suite 650
                                            Cleveland, OH 44115
                                            Telephone:  (216) 621-1312
                                            Facsimile:   (216) 621-0577
                                            Email:  gdegulis@mdllp.net

                                            William S. Scherman*
                                            David Debold*
                                            Jason J. Fleischer*
                                            Vladimir J. Semendyai*
                                            Jason Manion (0097031)*
                                            GIBSON, DUNN & CRUTCHER LLP
                                            1050 Connecticut Avenue, N.W.
                                            Washington, DC  20036-5306
                                            Telephone:  (202) 955-8500
                                            Facsimile:   (202) 467-0539

                                            **Pro Hac Vice* Application Forthcoming*

                                            *Attorneys for Plaintiffs*